MARY CROSS, *etc.*, *et al.*, *v.* A. W. BENSON, *Receiver, etc.*

No. 13,485. ( 75 Pac. 558.)

SYLLABUS BY THE COURT.

1. CONSTITUTIONAL LAW—*Homestead and Exemptions.* The constitutional exemption of a homestead from forced sale under process of law may survive to the family of its owner after his death.

2. ——— *Family of Homestead Owner Defined—Right of Wife after Husband's Death.* If a husband and wife occupy a tract of land belonging to him as a homestead, she is the family of the owner within the meaning of the constitution, and his death does not deprive her of the right to continue to be so designated in order to maintain the homestead, to which she takes title and which she continues to occupy, free from forced sale under process of law for the payment of his debts.

3. —— *Descents and Distributions—Purpose of Statute.*
The purpose of the statute of descents and distributions is to
provide for the transmission of title at death in case of intestacy
and to regulate the division of estates among heirs. It is not
primarily an exemption or homestead law; and though it may
enlarge the right to an exemption of real estate from appropria-
tion to the payment of debts, it cannot restrict the constitu-
tional guaranty.

4. WILLS—*Election of Widow Does Not Destroy Homestead
Right.* Upon the death of her husband a wife may elect to take
title under his will to their homestead, which she continues to
occupy, without subjecting it to the payment of his debts.

5. —— *Merely Formal Phrases will not Destroy Homestead
Character of Devised Property.* The use of merely formal
phrases will not make a devise of a homestead subject to the pay-
ment of the testator's debts; to do so, the language employed
must be unequivocal and imperative.

6. TRUST DEED—*Not Testamentary.* A trust deed examined and
held not to be testamentary in character.

7. HOMESTEAD AND EXEMPTIONS—*Member of the Family Defined.*
A minor child, who resides with her grandparents under such cir-
cumstances that she becomes in fact dependent upon them and
they become morally responsible for her nurture, becomes a mem-
ber of their family within the meaning of the homestead provision
of the constitution, without formal adoption; and this is true even
though her father, who is divorced from her mother, still lives,
and has a decree of court awarding her custody to him.

Error from Lyon district court; DENNIS MADDEN,
judge. Opinion filed February 6, 1904. Reversed.

*Kellogg & Madden,* and *Lambert & Huggins,* for plain-
tiffs in error.

*Rossington, Smith & Histed,* and *Graves & Hamer,* for
defendant in error.

The opinion of the court was delivered by

BURCH, J.: On the 4th day of September, 1894,
H. C. Cross, of the city of Emporia, died testate, leav-
ing as his heirs at law his widow, Sue S. Cross, and
an adult son, Charles S. Cross. At the time of his

death he was the owner of certain contiguous lots of ground within the limits of the city which in their entirety were less than one acre in extent and which were occupied as a residence by himself and wife. Their infant granddaughter, Mary, the child of Charles S. Cross, lived with them. Charles S. Cross had been divorced from Mary's mother. The decree dissolving their marriage awarded the legal custody of the child to her father, but by an understanding of the parties it was arranged that Mary should make her home with her grandparents. Thenceforth they assumed the care and responsibility of her nurture and she was treated as their child. The will of H. C. Cross expressed the desire that his debts and funeral expenses be first paid, and devised the homestead to his wife. Upon its probate the widow elected to take under the will. After the death of her husband, Mrs. Cross and Mary continued to reside upon the homestead property. Mrs. Cross continued to sustain the same cherishing relation toward Mary as before, and ultimately adopted her by formal proceedings in the probate court.

Charles S. Cross survived his father a little more than a year. On February 5, 1902, Sue S. Cross died, leaving a will which was afterward properly probated, in which the homestead was devised to F. C. Newman, as executor, to be sold, however, and the proceeds to be invested in interest-bearing securities which, with the income to accrue from them, were to be the property of Mary. On the day following that of the execution of the will Mrs. Cross executed a deed purporting to convey in fee the homestead, with full covenants of warranty, to F. C. Newman, as trustee for the benefit of Mary, reserving to herself, however, a life-estate, and providing that after her death the

32—68 KAN.

property should be sold and the proceeds devoted to the same uses as the will prescribed. A subsequent codicil to the will annulled a specific bequest and changed the beneficiaries of the residual portion of the estate, but did not disturb the devise of the homestead upon which Mary continued to abide alone.

Creditors of the estate of H. C. Cross secured a judgment subjecting this property to the payment of their claims, and the question for determination is whether that judgment was authorized by our constitution and laws. In support of the judgment the following claims are made:

"I. The constitutional exemption does not survive the death of the owner of the homestead. Any extension of the homestead estate beyond the death of the owner must be found, if at all, in the statute of descents and distributions.

"II. Under the statute of descents and distributions, a homestead estate does not survive for the benefit of a widow and child or children who have reached the age of majority, there being no minor heirs.

"III. After the death of the homestead owner, who dies testate, leaving children who have attained the age of majority and without minor heirs, his widow may elect to take under the statute of descents and distributions or under the will. If she elects to take under the will, she thereby abrogates her right to claim any homestead exemption against the debts of her husband.

"Applying the foregoing propositions of law to the case at bar, our position may be summarized:

"(a) At the time of the death of H. C. Cross, he leaving a widow and one son who had attained the years of majority, the homestead character of the property ceased and determined, and his widow and son, if he had died intestate, would have been entitled each to a moiety of the property under the statute of descents and distributions. Inasmuch as the only living adult son could not claim the integrity

and protection of the homestead, neither could the widow. (*b*) But H. C. Cross died testate, and in his will devised the whole of the property in question to his widow, and she electing to take thereunder, it follows that she thereby took the same subject to the, *ante-mortem* debts of her husband, the payment of which was expressly directed by his will.

"IV. Assuming, however, but merely for the purpose of argument, that Sue S. Cross did acquire a homestead under the will exempt from the debts of her husband, such homestead affected by such exemption could continue only during her life; and while she might sell or convey the property in her lifetime, free from the obligations of her husband, she could not devise it nor could her heirs inherit it exempt from the payment of her husband's debts.

"V. The trust deed to F. C. Newman, of March 2, 1901, was not a conveyance, but amounted merely to a testamentary disposition of her property in accordance with the terms of the will already made, and this is made conclusively apparent by her subsequent change in the disposition of her property by the codicil of November 21."

The principal question here proposed for determination is one of constitutional interpretation.

Out of the womb of history there has come to us an institution known as the family. Its establishment has been believed to be by the ordinance of divinity itself. "God setteth the solitary in families." The pagan Plato understood its fundamental importance; "Whatever is most excellent in the state must always begin at the fireside." And when the modern critical method of inquiry made it the subject of investigation, and the sciences of biology and anthropology and sociology and the rest had summed up and compared the results of their exhaustive researches, they concurred in proclaiming that, aside from its efficiency

1. Constitutional exemption of homestead survives to the family.

as an economic arrangement for the promotion of race and individual progress, the moral virtues which constitute the bright, consummate flower of our humanity all had their origin, received their nurture and attained their perfection within and through the family. Therefore, the present age, with its keener insight and its ampler understanding, regards the family with an enthusiasm and a respect more tender, more intense and more profound than ever before, and the courts will abate none of their jealousy to see that laws intended for its conservation and protection are administered in a spirit as beneficial and as kind as the language of the instruments will bear.

A consideration of the origin and purpose of the homestead right and of its establishment in the constitution of this state will show that the provisions made in that document were intended to be complete, and that all legislative action in attaining the desired end was intended to be dispensed with.

With a higher appreciation of the function and importance of the family came more liberal sentiments toward its submerged element, the wife, and her elevation, through an amelioration of the law. The word "family" has it root in the Oscan word "famul," which signifies a slave. Much of this primary meaning was applicable to the status of married women at the common law with reference to property. Marriage amounted to a spoliation of the woman and an investiture of the man with property in her personality, and the possession and enjoyment of her realty ; and her individuality of management and control of whatever was hers at marriage was completely merged in that of her husband. Under the same common law the creditor could seize and appropriate to the satisfaction of his debt the goods and the estates of

his debtor, without distinction as to whether they were held by virtue of his marital right or by other methods of acquisition and ownership. As a result, wives found themselves stripped of their possessions by the folly or misconduct of spendthrift husbands, reduced to penury without any fault of their own, and rendered powerless to retrieve their fortunes by the incapacity which the law imposed.

To eradicate these evils, hoary with the sanction of centuries, two remedial measures were proposed— the married woman's separate estate and the homestead right; the one seeking to restore to women their just share in the management and control of their own property, and the other seeking to guard against the sufferings of women and children who, through ill conduct or misadventure, were deprived of support, by segregating a modicum of property for undisturbed occupation as a home entirely exempt from the ordinary incidents of ownership— the right of free alienaation by the owner and the liability to seizure and sale for his debts.

Article 15 of the constitution contains provisions upon both these subjects. But the saving of a home to the family free from alienation, without joint consent, and beyond the reach of process of the law, was of overshadowing importance. Therefore, while section 6 directs the legislature to provide for the protection of the rights of women in acquiring and possessing property, real, personal and mixed, separate and apart from their husbands, section 9 itself creates, limits and defines the homestead right. The difference in treatment of the two subjects is strikingly shown by bringing the sections of the constitution relating to them in juxtaposition.

"6. The legislature shall provide for the protec-

tion of the rights of women, in acquiring and possessing property, real, personal and mixed, separate and apart from the husband; and shall also provide for their equal rights in the possession of their children."

"9. A homestead to the extent of one hundred and sixty acres of farming land, or of one acre within the limits of an incorporated town or city, occupied as a residence by the family of the owner, together with all the improvements on the same, shall be exempted from forced sale under any process of law, and shall not be alienated without the joint consent of husband and wife, when that relation exists; but no property shall be exempt from sale for taxes, or for the payment of obligations contracted for the purchase of said premises, or for the erection of improvements thereon: *Provided*, the provisions of this section shall not apply to any process of law obtained by virtue of a lien given by the consent of both husband and wife." (Secs. 6 and 9, art. 15, State Const.)

Upon the matter of homestead not only is legislative aid dispensed with, but legislative interference is foreclosed. Without any statute upon the subject, no forced sale of any homestead occupied in the manner prescribed could be lawful, and no conditions may be imposed by statute upon the enjoyment of the right.

Since this is true, it is not apparent why the framers of the constitution, with all their admirable solicitude for the poverty and pain of the innocent victims of weakness and folly and unpropitious fate, should forget the desolation and disaster which follow in the wake of death; why a wife and children should be so zealously screened so long as a husband and father lives to beat up the stream of the world's unkindness with them, but that a widow and orphans should be left to the whim and caprice of inconstant legislation. Indeed, it would seem to be something of an imputation to assert that the constitutional convention stopped

short in its labors and left the most delicate and the most urgent portion of its work unguarded to the legislature. The language of the constitution itself forbids such an interpretation. By its terms the area and appurtenances of the homestead are expressly limited ; the beneficiary of the right is expressly limited ; the manner of its enjoyment is expressly limited ; the method of transferring the estate in the land it covers is expressly limited ; the charges which may be made against it are expressly limited, and the character of process upon which it may be sold is expressly limited ; but the time during which occupation by the family of the owner shall be a barrier to its appropriation for the payment of debts is not limited. There is no time appointed beyond which it shall not endure.

To satisfy the creditors who press this suit it is necessary to engraft upon the words of the constitution, "shall be exempted from forced sale under any process of law," the alien phrase "during the lifetime of the owner whose family occupies it." The constitution itself forbears to express any such limitation. Such an interpretation can scarcely be made in a document which enumerates its own exceptions and prescribes its own limitations, and much less should it be undertaken when the result would be to abridge the scope and curtail the benignant power of a remedial charter.

Whenever, therefore, a homestead is once established it will endure as long as the enumerated elements essential to its existence continue to coordinate. The homestead may be voluntarily abandoned by those entitled to its privileges, it may be conveyed away, and the family itself may be dissolved until there is no one left to invoke the constitutional protection, as

in *Ellinger v. Thomas*, 64 Kan. 180, 67 Pac. 529; but so long as family occupation as a residence persists, no creditor may obtrude upon the sanctity of the homestead demesne.

Applying these propositions to the case at bar, and for the purpose of the application excluding Mary Cross from the family of her grandfather, it may be observed that, before the death of H. C. Cross his wife, Sue S. Cross, constituted his family. That he had an adult son living apart from him in no way disparaged that fact. She was "the family of the owner" of the lots. Because she was his family and occupied the lots as a residence it was exempt from the payment of his debts. When her husband died the conditions in respect of which the constitution gave her a home were not improved. The gaunt gray wolf of debt that had been skulking in the shadows of her habitation and crouching at its door could ravage still. She continued, as before, to be the constituent element of the family of H. C. Cross; she continued in the rightful occupation of the homestead as her residence; and it would turn into mockery the constitutional provision prepared against the days of her adversity to say that her husband's creditors might enter as soon as his hearse had left the door.

*2. Wife may constitute family of homestead owner.*

It is said, however, that in the light of the statute of descents and distributions the homestead must be regarded as ceasing at the death of H. C. Cross. The statute of descents and distributions can shed no light upon the subject. The constitution creates the homestead. This court is the final interpreter of that instrument, and no legislative misconception of its scope, if any

*3. Purpose of statute of descents and distributions.*

such should become manifest, can be permitted to diminish the field of its operation.

However, the purpose of the statute of descents and distributions must be taken to be what its name imports — a statute providing for the transmission of title at death in cases of intestacy, and regulating the division of estates among heirs. It is not an exemption or homestead law. Upon the death of the owner the title to his land must vest anew or escheat to the state. If there be no will, the law alone accomplishes the transfer and names the persons who take.   With this devolution of title the constitution has nothing to do. Property descending to heirs must be distributed, properly to be enjoyed.   With this distribution the constitution has nothing to do.   These are matters left by the constitution to the legislature.   But homestead interests are disturbed by them no more than the division of the title and the division of the land necessarily require, and the rights of creditors are enlarged no further than these circumstances necessarily compel.   Neither descent nor distribution can make subject to execution for payment of debts any portion of the homestead inherited and occupied by a person who is not by death, or by subsequent circumstances, taken from the category of the family of the owner.

If in this case there had been no will, upon the death of H. C. Cross the title to the homestead would have descended to Sue S. Cross, the widow, and the adult son, Charles S. Cross.   It may be granted, for the purpose of the illustration, that because the latter was of mature age partition could have been compelled.   But because Sue S. Cross was the beneficiary of a homestead right in the property her share upon a division would have retained its homestead character

as long as she chose to observe the requirements making it such.

The primary function of the statute of descents and distributions, therefore, is the transfer of title and the partition of the estate among its inheritors ; and while it may enlarge the privilege of freedom from appropriation to the payment of debts, it cannot restrict the constitutional guaranty. If it be said that this construction of the constitution is not in harmony with those provisions of the statute of descents and distributions which seem to permit no homestead privilege to a widow when adult children also survive the owner's death, it can only be replied that the constitution is the paramount law and its mandates must be obeyed.

It is further claimed that the taking of title under the will of a homestead owner necessarily abrogates the homestead right because a person must devise his lands "subject nevertheless to the rights of creditors." (Gen. Stat. 1901, § 7937.) This proposition ignores the persistence of the exemption from forced sale, independent of changes in the title already illustrated in the case of descent. In this case Sue S. Cross occupied the lots in question as a residence and as the family of the owner, H. C. Cross. By the will of the owner the title was devised to her and she elected to take under the will. But there was no hiatus in her occupation of the premises as a residence and as the family of H. C. Cross. The homestead privilege was no more disturbed than it would have been had H. C. Cross deeded the lots to his wife in his lifetime and while she was occupying them as a homestead. She continued in the enjoyment of precisely the same right to immunity from the loss of her hearthstone at the suit of her husband's creditors as before his death. And

*4. Homestead right not abrogated by election to take under the will.*

since the lots in question were continually impressed with the homestead interest of Sue S. Cross in the lifetime of her husband, at the date of his death and during the following years until her own demise, creditors enjoyed no rights to which such lots were subject or to which the making of a will of them was subject.

It is asserted that, since Sue S. Cross elected to take the property in question under the terms of a will in which a request that the testator's debts and funeral expenses be first paid was expressed, she held it subject to the payment of such charges. In England the validity of the rule that a general direction for the payment of debts creates a charge upon real estate is now doubted.

5. Merely formal phrases in will do not annul homestead right.

"Such, then, is the long line of cases in which it has been held that a general direction by a testator that his debts shall be paid charges them upon his real estate. Though certainly in some of the wills there were expressions which might be fairly considered to sustain the construction independently of any such doctrine, it seems to be generally admitted that the courts have allowed their anxiety to prevent moral injustice by the exclusion of creditors, 'and that men should not sin in their graves,' to carry them beyond the limits prescribed by established general principles of construction." (2 Jarman on Wills, 2d ed.; 535.)

In Bigelow on Wills, 317, it is said :

"Indeed, as a new question, there would be ground for question whether a direction to pay debts and legacies should be deemed a charge upon land devised."

In the *Matter of City of Rochester*, 110 N. Y. 159, 17 N. E. 740, it was said :

"Payment of debts will not be charged upon a devise of real estate without clear evidence of such an

intent in the will; the intention may not be presumed merely from the use of formal words, or the presence of commonly employed phrases.''

Other American cases are to the same effect. (*Starke v. Wilson*, 65 Ala. 576; *Cooch's Exr. v. Cooch's Admr. et al.*, 5 Hous. [Del.] 540; *Matter of Bingham*, 127 N. Y. 296, 27 N. E. 1055; *Matter of Powers*, 124 id. 361, 26 N. E. 940.)

Much more imperative and unequivocal must be the language of a will which would subject to the payment of debts that property toward which the eye of the creditor need never be turned.

Finally, it is said that even though Sue S. Cross might have the right to enjoy the property in question free from her husband's debts during her lifetime and might have the right to convey it disencumbered **6. Trust deed not testamentary.** of such obligations, yet the Newman trust deed was insufficient for such purpose because it was testamentary in character. A policy to be followed in the construction of doubtful instruments of the character under consideration was adopted in *Love v. Blauw*, 61 Kan. 496, 59 Pac. 1059, 48 L. R. A. 257, 78 Am. St. Rep. 334, and applied in *Durand v. Higgins*, 67 id. 110, 72 Pac. 567. It will not now be departed from. The codicil to the will, executed after the relations of the parties to the deed had become fixed, could not alter their rights.

The constitutional question above discussed is a new one. Because of the diversity of their provisions and the contrariety of view of the courts construing them, little assistance has been derived from the constitutions and laws of other states. No previous decision of this court has been made with the interpretation of the constitution here adopted in mind. Many expressions of opinion to be found in earlier

cases point the way.   Some affirmations by way of argument and illustration appear to be opposed to the viewhere taken.   But upon a careful discrimination of the precise points determined it will appear that no former decision need now be overturned.   The case of *Battey v. Barker*, 62 Kan. 517, 64 Pac. 74, 56 L. R. A. 33, is most in conflict.   The doctrine there applied is the strict one upon which *Ellinger v. Thomas*, 64 Kan. 180, 67 Pac. 529, is based.   In the latter case it was held that a sole adult remnant could not himself constitute his own family, so as to preserve land exempt from the payment of his own debts.   Thus, it might be argued that, after the death of H. C. Cross, Sue S. Cross could not herself be her own family as against the claims of her creditors.

If, however, this be admitted, a single individual, Sue S. Cross, was sufficient to constitute the family of H. C. Cross, and because of her sole existence the precincts of her home were inviolable by his creditors. H. C. Cross and Sue S. Cross alone exhibited the clear distinction of the constitution between an owner whose property is liable for his debts and his family who would be unhoused if the liability were enforced ; and his death could not deprive her of the right to continue to be designated the family of H. C. Cross as against the claims of those same creditors.

In order that the ground of this decision may not be misunderstood the relation of Mary Cross to this homestead has been excluded from consideration.   If, however, a plurality of persons were required to form the family of H. C. Cross the condition was fulfilled.   Even though her father was alive and held a court decree for her custody, by the conduct of the parties Mary Cross became a member of the family of H. C. Cross, within the mean-

7. Member of the family defined.

ing of the homestead provision of the constitution. Formal adoption was not necessary, The fact of her actual dependence upon her grandparents and their consequent moral responsibility for her nurture was sufficient.

"It is also well settled that it is not necessary that the relation of husband and wife, nor that of parent and child, should exist in order to constitute a family. *Bradley v. Rodelsperger*, 3 S. C. 226; *Garaty v. DuBose*, 5 id. 493; *Moore v. Parker*, 13 id. 486; *Rollings v. Evans*, 23 id. 316. . . . Nor do we think that it is necessary that there should be any legal obligation on the part of one claiming to be the head of a family to support the members thereof; but a moral duty, arising from ties of blood, or possibly other similar relations, will be sufficient. As is said in 7 Am. & Eng. Encycl. L. 804, note 2, 'the test of a legal duty has been rarely applied, and unquestionably a moral duty to support the members of a family is sufficient to constitute one its head,' citing Thomp. on Homest., section 45. Accordingly we find that it has been held in *Arnold v. Waltz* (53 Iowa, 706; s. c., 36 Am. Rep. 248), that an unmarried woman keeping house, and there bringing up two children of her deceased sister, is the head of a family, though she has taken no steps to adopt said children under the statute of that state; in *Wade v. Jones* (20 Mo. 75, 61 Am. Dec. 584), that a brother living with his widowed sister and her four small children and providing for them is the head of a family; in *Bailey v. Cumings* (16 Nat. Bank. Reg. 382), that a bachelor who supports a widowed sister who keeps house for him may be the head of a family.

"We are inclined to agree with what is said by Anderson; J., in *Calhoun v. Williams* (32 Gratt. 18; s. c., 34 Am. Rep. 759): 'The whole theory and policy of the homestead (law) is founded upon the principle that there is a natural and moral obligation on the head of a family to provide for the support of

his wife and children and other persons dependent on him, towards whom he stands almost *in loco parentis*, which is, if not paramount, equal to his obligation to pay his debts. ⁝ . . The family may consist of a wife and children, or of other persons who may stand in a state of dependence in the family relation ; or it may consist of persons standing in either of these relations, whether the father or mother, or a brother or a sister or other relation, is the head ; but they must be persons who are dependent, in some measure, on the head for support, and who have an interest in his holding his property, and would be prejudiced by its seizure and sale under execution or other process, and who would be benefited by its exemption.'" (*Moyer v. Drummond*, 32 S. C. 165, 167, 10 S. E. 952, 7 L. R. A. 747, 17 Am. St. Rep. 850.)

"While there was no legal obligation on the part of this widow to support the minor children of her husband, yet we think that, inasmuch as she undertook to keep them together, and to care for and support them, as the evidence shows she did, they all remained members of the testator's family, and she thereby became the head of that family and under the laws of this state was entitled to a homestead as the head of a family. See *Capek v. Kropik*, 129 Ill. 509, s. c., 21 N. E. Rep. 836, where it was held that, on the death of his wife, a widower together with his minor *Step-children* was entitled to a homestead in an entire lot of land which he had held in common with his wife. Moreover, when Mrs. Holloway took the minor children under her care and custody, she stood in the relation of a parent to them and took upon herself that obligation. She then was under a moral obligation to support and maintain these children, and the authorities hold that such a moral obligation is sufficient to entitle her to have a homestead set apart for the benefit of herself and the minor children." (*Holloway v. Holloway*, 86 Ga. 576, 578, 12 S. E. 943, 11 L. R. A. 518, 22 Am. St. Rep. 484.)

From all this, it follows that the judgment of the

district court must be reversed, with direction to that tribunal to enter judgment upon the agreed facts in favor of the defendants, and it is so ordered.

All the Justices concurring.