No. 45,257

In the Matter of the Estate of CHARLES W. JOHNSON, Deceased.
(VERNON KEPHART, Executor of the Estate of Charles W. Johnson;
and LORENA MEISENHEIMER, OPAL KREUTZER, LEONA JOHNSTON
and CARL JOHNSON, *Appellees,* v. HAZEL M. JOHNSON, *Appellant.*)

(452 P. 2d 286)

Opinion filed March 8, 1969.

R. R. *Mitchell*, of Dodge City, argued the cause, and A. L. *Moffat*, of Kinsley, and *Don C. Smith* and *David L. Patton*, of Dodge City, were with him on the brief for the appellant.

*Bill Murray*, of Pratt, argued the cause, and *William N. Beezley*, of Kinsley, and *B. V. Hampton* and *Bill Hampton, Jr.*, of Pratt, were with him on the brief for the appellees.

The opinion of the court was delivered by

O'CONNOR, J.: This appeal grows out of proceedings in which Hazel M. Johnson, the surviving spouse of Charles W. Johnson, deceased, seeks to avoid the enforcement of an antenuptial agreement and also to strike certain items from the inventory of Charles'

estate as being property belonging to her. From an adverse decision in the district court, Hazel has appealed.

Three questions are presented for our consideration: (1) enforceability of the antenuptial agreement, (2) ownership of a joint checking account in the name of Charles or Hazel "or Survivor," and (3) whether the executor or surviving widow is entitled to proceeds from crops growing on the homestead at the time of Charles' death.

The facts are not in serious dispute, most of them having been stipulated to at the pretrial conference in district court.

Charles W. Johnson and Hazel M. Bowers were married April 2, 1961. Charles was nearly seventy-nine years of age, and Hazel was fifty-nine. This was the second marriage for each, their prior spouses having died. Hazel had two children by her first marriage. Both are living and are adults. Charles had five children by his first marriage. Two of them predeceased him and left no surviving heirs. One son predeceased him and left two children. Charles' two living children and the two grandchildren, along with the executor of Charles' estate, are appellees here.

On April 1, 1961, the day prior to their marriage, Charles and Hazel executed before a notary public an antenuptial agreement that had been prepared by Charles' attorney, Mr. William N. Beezley, of Kinsley. Mr. A. L. Moffat, who had acted as attorney for Hazel over a period of years, counseled with and advised her in respect to her rights and obligations under the law, in view of her contemplated marriage to Charles, and further explained to her the terms of the agreement. The agreement generally provided that all property owned by each of them at the commencement of the marriage, or thereafter acquired by either of them during the marriage, should be held and controlled by him or her and be subject to his or her disposition in the same manner and to the same extent as if the proposed marriage had never been celebrated. A further provision was that upon the death of either party, the survivor, because of such survivorship or by way of inheritance, would not have or assert any claim to the property and estate of the deceased party, except in accordance with, and limited by, the following provisions for Hazel:

"It is covenanted and agreed that the said Hazel M. Bowers shall have and receive out of the estate of the said Charles W. Johnson, should she survive him as his widow, the following, to-wit: a distributive share of ¼th

of the proceeds for distribution of the sale of the following described real estate, to-wit:

(280 acres of land in Edwards county)

as provided by the 5th paragraph of the last will and testament of the said Charles W. Johnson, party of the first part herein, and dated December 28, 1959, and in addition thereto the widow's statutory allowances from the personal estate of the party of the first part and in addition thereto ¼th of the personal estate for distribution on the final settlement of the estate of the party of the first part, as and for the full interest and share of the said Hazel M. Bowers in the estate of the said Charles W. Johnson, should she survive him. It is further agreed that after the marriage of the parties hereto the said Charles W. Johnson, party of the first [part] agrees to make a last will and testament conformably to and in ratification of this agreement and the said party of the second part, Hazel M. Bowers, agrees to consent to the provisions of such last will and testament.

. . . . . . . . . . . . . .

"And the said Hazel M. Bowers hereby relinquishes unto the heirs, devisees, legatees, executors, administrators and assigns of the said party of the first part, any and all her claims, distributive shares, interest, right, title and estate in or to the property and estate of which the said Charles W. Johnson, shall die seized and possessed, except as provided by the terms of this agreement.

"It is further understood and agreed that the said Charles W. Johnson has made full disclosure to the said Hazel M. Bowers of the size, extent and value of his property and estate. And the said Hazel M. Bowers, hereby acknowledges and declares that prior to and in the execution of this agreement, she has had the independent advice of counsel of a competent attorney of her own choosing, employed by herself for the purpose of advising with her in all matters in connection with this agreement."

The fifth paragraph of Charles' last will and testament referred to in the agreement provided the executor was to sell the 280 acres, and after the payment of debts, taxes and costs of administration, the balance of the proceeds of the sale were to be distributed to Charles' two daughters and one son (the latter who predeceased Charles).

After they were married, and until Charles' death, the Johnsons resided on the land described in the will and antenuptial agreement. During the nearly five years of their marriage Charles failed to execute a new will, as called for by the terms of the agreement, and upon his death on January 4, 1966, his will dated December 28, 1959, and a codicil thereto dated August 4, 1960, were admitted to probate. Mr. Vernon Kephart, cashier of The Macksville State Bank, was appointed and qualified as executor. On April 13, 1966, Hazel filed her election to take under the laws of intestate succession. Thereafter, the executor filed a petition in probate court,

setting up the antenuptial agreement, and requesting that the widow's election to take under the law be set aside and the agreement be enforced in accordance with its terms. In her answer Hazel alleged the agreement was not binding and enforceable because (1) Charles did not execute a new will after their marriage, as called for by the terms of the antenuptial agreement, and (2) that since the parties had established 160 acres of the 280 acres of land as a homestead, which was so claimed by her as the surviving spouse, the provisions of the agreement directing that the 280 acres be sold were rendered inoperative and incapable of enforcement. After a hearing on the petition, the probate court found in Hazel's favor and refused to set aside her election or enforce the agreement.

Meanwhile, the executor filed an inventory on June 13, 1966, in which were included a checking account, certificate of deposit and promissory note. Hazel's name had been added to the checking account about four months after the marriage, and at Charles' death the account reflected a balance in excess of $10,000. The certificate of deposit had been purchased by Charles July 22, 1963, in the amount of $4,000, and was payable to "Himself or Mrs. Hazel M. Johnson." The promissory note, dated May 21, 1964, was in the face amount of $1,600 and was payable to "Charles W. Johnson or Hazel M. Johnson."

Subsequent to the filing of the inventory Hazel filed a petition, claiming her statutory allowances and 160 acres of the 280 acres as a homestead, and further requesting the three items above be stricken from the inventory, as well as the landlord's share of the growing crops on the homestead. The probate court granted Hazel's petition in its entirety.

The executor and Charles' heirs appealed both rulings of the probate court to the district court, where, as disclosed by the pretrial order, the parties stipulated and agreed:

"That Hazel Johnson knew and understood the contents of Paragraph 5 of the decedent's will; that the antenuptial contract dated April 1, 1961, was fairly and understandably made; that its terms are just and equitable, and the amount provided for the widow under the terms of the will and contract is not disproportionate to the estate of the decedent; that the decedent did fully disclose his property to Hazel M. Bowers prior to the execution of the antenuptial contract dated April 1, 1961, and that neither of the parties misrepresented their respective properties to the other; that each of the parties executed the antenupital contract after having received independent legal advice as to their respective rights, and that there was no fraud, misrepresentation, nor overreaching on the part of Charles W. Johnson, the decedent."

The only testimony offered at the hearing was that of Hazel and the farm tenant. Thereafter, on June 28, 1967, the district judge filed a lengthy memorandum opinion in which he concluded, insofar as relevant to this appeal, (1) the antenuptial agreement was valid and enforceable, and Hazel's election to take under the law should be set aside; (2) the checking account was not a joint tenancy with right of survivorship account, and any rights of Hazel to the account terminated at Charles' death; and (3) the executor was entitled to the proceeds from all crops growing on the homestead at the time of Charles' death. Judgment was entered accordingly, and this appeal followed.

Although not involved here, since appellees have not cross-appealed from any part of the judgment, we note the district court concluded the certificate of deposit and promissory note were held by Charles and Hazel as joint tenants with the right of survivorship and Hazel was owner of each item as the surviving joint tenant.

Hazel's argument on her contention the antenuptial agreement is void and unenforceable is twofold. She first urges the agreement is a nullity because of Charles' failure to make a last will and testament "conformably to and in ratification of" its terms. She points to her uncontradicted oral testimony at the district court hearing, wherein she testified that on the day she and Charles signed the agreement, Mr. Beezley told both of them "the agreement wouldn't be any good unless a new will was made." This testimony was objected to, but the district judge apparently admitted it to show the circumstances surrounding the transaction. While the admissibility of such testimony may be debatable, the district court apparently gave it no weight or credence, which the court was at liberty to do. (See, *Gibbs v. Central Surety & Ins. Corp.*, 163 Kan. 252, 181 P. 2d 498; *In re Estate of Johnson*, 155 Kan. 437, 125 P. 2d 352.)

If a contract is clear and unambiguous, which we believe this agreement is, the terms thereof must be construed in such manner as to give effect to the intention of the parties at the time they entered into the contract, and this must be determined from the four corners of the instrument itself. (*Wiles v. Wiles*, 202 Kan. 613, 452 P. 2d 271; *Kittel v. Krause*, 185 Kan. 681, 347 P. 2d 269.) Words cannot be read into the agreement which impart an intent wholly unexpressed when it was executed. (*Mays v. Middle Iowa Realty Corp.*, 202 Kan. 712, 452 P. 2d 279.) The result is that where, as here, there is no fraud or mutual mistake, a plain and unambiguous written contract must be enforced according to its terms, and the

rights of the parties are governed by the terms of the contract without the aid of parol evidence. (See, *In re Estate of Smith,* 199 Kan. 89, 427 P. 2d 443.)

The thrust of Hazel's argument is that the antenuptial agreement did not become a valid and binding contract because it was never "ratified" by Charles making a new will. To support her position, Hazel relies solely on *In re Estate of Garden,* 158 Kan. 554, 148 P. 2d 745, for the proposition that an antenuptial agreement and will constitute one contract, each complementary to the other, and when a husband fails to provide by will that which he agreed, the agreement is void. A review of the facts in that case discloses a sharp contrast from those here. There, the prospective bride signed an antenuptial agreement with her betrothed husband upon his representation and explanation that its purpose was to give him unrestricted freedom to transact his varied and extensive business affairs as he saw fit, and upon his oral promise that he would make a will devising to her a substantial share of his estate, which he accordingly did. Approximately two years after their marriage the husband made a new will which varied substantially from the one he had executed on the eve of his marriage. There was parol evidence regarding the facts and circumstances under which the antenuptial agreement and first will were executed, including the betrothed husband's assurances to his prospective wife that the two instruments were a part of each other and were not to be changed without her consent. In holding that the widow had the right to elect to take her statutory share of her husband's estate, and not under the later will, this court said the antenuptial agreement and first will should be read and construed together as complementary instruments constituting one agreement of the parties. The court noted that the antenuptial agreement read by itself gave the prospective bride absolutely nothing. In fact, all of the testimony was to the effect she signed the agreement solely because of the assurances and representations by the prospective husband that she would not be barred from his estate because of the will he was executing. The court further commented on the lack of the essential element of fairness to her in respect to the provisions of the antenuptial agreement unless the will were considered as part of the antenuptial compact between the parties. A further observation noted in the opinion was that had the prospective husband made his representations to her in good faith and believed he could change

his will after the marriage, the agreement was not understandingly made; and even if he believed he could later alter his will after the marriage without his wife's consent, then he perpetrated a fraud on her when he assured her to the contrary. It is apparent that fraud, overreaching, lack of fairness and understanding were significant factors in the case. The antenuptial agreement and will, when read and construed together as one instrument, were materially breached by the husband's second will, and under all the circumstances, the widow was permitted to elect to take under the law and disregard the antenuptial contract.

Hazel's attempt to equate her position here with that of the wife in *Garden* is completely unjustified. For one thing, the antenuptial agreement provided for her to receive a substantial part of Charles' estate. Further, the parties have stipulated, and the district court found, that Charles dealt fairly with his affianced wife at all times, the agreement was fairly and understandingly made, its terms were just and equitable, the amount Hazel was to receive was not disproportionate to Charles' estate, there was full disclosure, each party received independent legal advice before executing the agreement, and there was clearly no fraud, misrepresentation, or overreaching.

The well-established rule in this state is that contracts made either before or after marriage, the purpose of which is to fix property rights between a husband and wife, are to be liberally interpreted to carry out the intention of the makers, and to uphold such contracts where they are fairly and understandably made, are just and equitable in their provisions, and are not obtained by fraud or overreaching ( *e. g., In re Estate of West,* 194 Kan. 736, 402 P. 2d 117; *In re Estate of Gillen,* 191 Kan. 254, 380 P. 2d 357; *In re Estate of Ward,* 178 Kan. 366, 285 P. 2d 1081; *In re Estate of Cantrell,* 154 Kan. 546, 119 P. 2d 483). The rules governing the construction of contracts generally are also applicable to construction of antenuptial contracts. ( *In re Estate of West,* supra; *In re Estate of Brown,* 189 Kan. 193, 368 P. 2d 27; *In re Estate of Hill,* 162 Kan. 385, 176 P. 2d 515.)

Hazel, in effect, seeks to rescind the antenuptial agreement because of Charles' purported breach of its terms. But the right to rescind a contract is extreme and does not necessarily arise from every breach. To warrant rescission, the breach must be material and the failure to perform so substantial as to defeat the object of the parties in making the agreement. A breach which goes to only a part of the consideration, which is incidental and subordinate to

the main purpose of a contract, does not warrant a rescission. (*Baron v. Lyman*, 136 Kan. 842, 18 P. 2d 137; 17 Am. Jur. 2d, Contracts § 504; 17A C. J. S., Contracts § 422 [1]; Corbin on Contracts § 1104.)

In respect to the right of a party to rescind an antenuptial agreement, we find the following statement from 41 Am. Jur. 2d, Husband and Wife § 293, which was quoted in substantial part in *In re Estate of Ward*, supra:

"The general rule is that where parties enter into an antenuptial agreement, each must perform the terms and conditions of that agreement before he or she can claim the benefits to be derived therefrom. However, the rule that equity will not compel a rescission where there has been partial performance has been applied to a marriage settlement where the marriage has occurred but the claim is made that other considerations, such as to be a kind and dutiful spouse, to use property for the joint benefit of the spouses, and to take care of the other spouse in old age, have not been complied with. It has been held that since marriage is a consideration that cannot be restored, covenants in a marriage settlement or agreement are independent, and failure of their performance by one party does not defeat his or her right to performance by the other, if the former is willing and can perform or the latter has a right to damages for the breach, . . ."

(Also, see, 41 Am. Jur. 2d, Husband and Wife § 310.)

One of our early cases, *Gordon v. Munn*, 87 Kan. 624, 125 Pac. 1, rehearing denied 88 Kan. 72, 127 Pac. 764, while factually not on all fours, is strongly indicative of the reluctance of courts to rescind or deny specific performance of an antenuptial agreement in the absence of fraud or other equitable considerations. There, an antenuptial contract provided by its terms that the prospective wife waived all right, title, interest and inheritance in property of her intended husband in consideration for his agreeing to convey to her by deed two pieces of real estate to be her sole property. The husband failed to execute the deed as promised. This court held that under the circumstances, where there was no deceit or fraud, the agreement vested equitable title to the real estate in the wife, and the failure of the husband to execute the conveyance did not prevent the enforcement of the agreement.

Similarly, in *In re Estate of Ward*, supra, the parties had executed an antenuptial agreement providing that the intended husband was to purchase a home for his future wife to live in for the rest of her life in the event he predeceased her. The husband died eighty-three days after the marriage and before a home could be purchased. The widow requested that she be permitted to take

under the law, and sought to set aside the antenuptial contract for various reasons, including its execution had been obtained by fraud, and that the decedent had failed to comply with the provisions regarding the purchase of a home. The court held there was no proof of fraud, the contract was not void for lack of consideration, and that the decedent's failure to fulfill his promise to buy a home during his lifetime, standing alone, was insufficient to invalidate the contract or render it unenforceable.

For cases from other jurisdictions holding that in the absence of fraud a wife is not entitled to rescind an antenuptial agreement, although the husband has failed to perform a covenant thereof, see, *Wellington v. Rugg*, 243 Mass. 30, 136 N. E. 831; *Cantor v. Cantor* (Ohio), 174 N. E. 2d 304; *In re Eisner's Will*, 15 Misc. 2d 361, 181 N. Y. S. 2d 327.

Under the facts here we are unable to say that Charles' failure to execute a will in conformity with the provisions of the antenuptial agreement was a substantial or fundamental breach going to the very heart of the agreement. Indeed, his failure to make a will did not defeat the object of the parties in making the agreement in the first place. When the parties entered into the agreement, Hazel had no intention of receiving anything more from Charles' estate than was provided for her in the agreement. In contrast with the facts in *Garden*, had Charles made a will *conforming* to the provisions of the agreement, Hazel would have received the same portion of his estate as provided for her in the agreement. Hazel's rights, whether derived from the antenuptial agreement or from a later will embodying the provisions of the agreement, were identical. We subscribe to the statement of the district judge in his memorandum decision that

". . . it [the contract] said the will was to conform to the contract, and was to be in ratification of the contract. A will doing only those things would have been sufficient to meet the terms of his contract; so in reality the making of a new will would be surplusage."

The second part of Hazel's argument on the unenforceability of the antenuptial agreement concerns the sale of the 280 acres of real estate subject to her homestead rights in 160 acres thereof. She does not question the legality of such a sale; her main complaint is that the sale price of the land subject to her homestead would be seriously depressed, thus defeating what was contemplated by the provisions for her benefit contained in the antenuptial agreement.

The appellees concede Hazel is entitled to her homestead rights;

hence, we do not have the issue of whether she waived those rights under the terms of the antenuptial contract. (See, *In re Estate of Neis*, 170 Kan. 254, 225 P. 2d 110; *In re Estate of Place*, 166 Kan. 528, 203 P. 2d 132.)

As a general rule, in order for impossibility of performance to constitute a ground for rescission, it must clearly appear that the only performance possible would be essentially different from that promised in the contract. (17 Am. Jur. 2d, Contracts § 506.) A close examination of the terms of the antenuptial agreement discloses that no specific reference was made in regard to Hazel's right to claim a homestead in the event Charles predeceased her. Other than the general provisions in the agreement whereby Hazel relinquished all claims, interest, right and title in or to the property and estate of Charles, except as provided in the agreement, no attempt was made to bar her from claiming a homestead in the event she and Charles established one on the real estate in question after their marriage. Indeed, we have said homestead rights of the wife cannot be affected by an antenuptial agreement. (*In re Estate of Neis*, supra; *In re Estate of Place*, supra.) Had Charles later made a will providing for Hazel, in accordance with the terms of the agreement, and Hazel had consented thereto, she would not have waived her right to the homestead unless it clearly appeared from the will that the provisions therein made for her were intended to be in lieu of such rights. (K. S. A. 59-404.) Since the appellees raise no question to the contrary, we may safely assume that at the time the antenuptial agreement was entered into, Hazel's right to any future homestead was intended to remain unfettered.

The antenuptial agreement provided that in addition to one-fourth of the proceeds from the sale of the real estate Hazel was to receive her widow's statutory allowances and one-fourth of Charles' personal estate. The parties agree the terms of the agreement were just and equitable, and the amount provided for the widow was not disproportionate to Charles' estate. The agreement gave Hazel a substantial portion of the estate in addition to the homestead rights granted her by law. (See, *In re Estate of Hilliard*, 172 Kan. 552, 241 P. 2d 729.) She, of course, could, at Charles' death, have relinquished the homestead, but this she did not choose to do. For that matter, if Hazel could, and did, waive all homestead rights by the terms of the agreement, she now, by claiming her homestead, is receiving more than was originally contemplated. In our view of the situation, Hazel is in no position to urge the sale of the land

subject to her homestead will defeat the object and purposes of the agreement and justify its rescission.

Hazel advances other arguments, but none of them is helpful to her cause and will not be discussed. We hold that she is not entitled to rescind the antenuptial agreement and be relieved from its provisions. Charles' heirs and the executor of his estate stand ready to perform the terms of the agreement. The district court properly determined the agreement was enforceable and Hazel is entitled to receive the share of Charles' estate in accordance with those terms.

Hazel next asserts the district court erred in determining the checking account was not a joint tenancy account, title to which passed to her as the surviving joint tenant at Charles' death. The record reveals that at the time of the marriage Charles maintained a checking account in The Macksville State Bank. According to Hazel's testimony, about three weeks after their marriage Charles took her to the bank and told the bank officials to honor her checks on his account. In August 1961, Charles and Hazel again went to the bank and Charles advised the officials he wanted his account changed to a "joint account." On this occasion they signed a signature card. Except for one small social security check of Hazel's, all other deposits to the account were made with Charles' money. Hazel wrote numerous checks on the account, both before and after the signature card was executed.

The card was entitled "Depositor's Contract and Signature Card," with printed provisions and appropriate spaces on both sides. The front side pertained to the "Signature Card" portion of the instrument. A typewritten notation "Johnson, Chas W. or Hazel Johnson or Survivor" appeared in the upper right-hand corner. There followed a provision that the bank was authorized to recognize any of the signatures "subscribed below" in payment of funds or the transaction of any business for the account. Four types of accounts were shown, with an appropriate box to be checked after each one. A typewritten "X" had been inserted after the word "Joint." Following were the signatures of "Chas W. Johnson" and "Hazel Johnson." Near the bottom of the front side of the card appeared the words "Depositor's Contract," followed by seven paragraphs in small print, which continued to the back of the card. One of these paragraphs referred specifically to "Joint Accounts" and provided that all sums on deposit or later deposited by either or both of said joint depositors, were to be owned by them jointly, with right of

survivorship, and were subject to check or receipt of either of them or the survivor of them. Directly following the last provision of the "Depositor's Contract" on the back of the card appeared the statement, "The terms of the above contract have been read and are hereby agreed to by owner of account." Following were two signature lines which *were not signed.*

The district court, after noting the contract portion of the card was not signed, found that Hazel's name was added only for Charles' convenience and not with the intent to give her a half interest or joint tenancy with survivorship interest in the account. The court concluded that inasmuch as a joint tenancy must be established with clarity and certainty under the requirements of K. S. A. 58-501, Hazel's claim must fail and any rights she had to said account terminated upon Charles' death.

Hazel contends that under *Malone v. Sullivan,* 136 Kan. 193, 14 P. 2d 647, 85 A. L. R. 275, and *Simonich, Executrix v. Wilt,* 197 Kan. 417, 417 P. 2d 139, a joint tenancy account with right of survivorship was clearly established.

Whether or not a joint tenancy bank account is created in the name of a depositor and another must be determined on contract principles. (*In re Estate of Smith,* 199 Kan. 89, 427 P. 2d 443.) If the depositor executes an account signature card which contains as part of its provisions an agreement in clear and unambiguous language that a joint tenancy account with the right of survivorship was intended, then such an account is created and the agreement is enforceable according to its terms. In such case, the signature card constitutes a contract in writing between the depositor and the bank, and parol evidence of an understanding at variance with its terms cannot be considered. (*In re Estate of Smith,* supra; *Simonich, Executrix v. Wilt,* supra.) When, however, the language of the written instrument signed by the depositor is uncertain or ambiguous, parol evidence relating to the facts and circumstances existing prior to and contemporaneously with the execution of the instrument is admissible in order to clarify the intention of the depositor at the time of the creation of the account. We have held that when a two-party account is opened without the use of a signature card or an instrument in writing signed by the depositor, a valid joint tenancy account between the depositor and bank may nevertheless be proved by parol evidence if the terms of the agreement clearly disclose that a joint tenancy was intended to be established. The all-important thing is the clarity with which the intent of the de-

positor is expressed at the time the transaction is initiated. (*Edwards v. Ledford,* 201 Kan. 518, 441 P. 2d 834, and authorities therein cited.)

Here, the "Depositor's Contract" portion of the card was not executed, so we do not have a signed written instrument containing express language which otherwise would be sufficient to create a joint tenancy account. Charles and Hazel signed only the "Signature Card" portion of the instrument. This portion contained a check mark after "Joint" account. Absent is any language in conjunction with "Joint" account to indicate the parties intended to incorporate the provisions relating to "Joint Accounts" appearing in the "Depositor's Contract" on the back of the instrument. The typewritten notation "Johnson, Chas W. or Hazel Johnson or Survivor," even if considered as a written memorandum of some oral agreement or arrangement pursuant to which the account was established, is inconclusive as to the true intention of the parties or the terms of any agreement. (*Edwards v. Ledford,* supra.) This court has said that similar language, when measured by the requirements of K. S. A. 58-501, is not sufficiently clear to establish a joint tenancy with right of survivorship. (*Miller v. Higgins,* 188 Kan. 736, 366 P. 2d 257; *Riggs v. Snell,* 186 Kan. 355, 350 P. 2d 54; *In re Estate of Swingle,* 178 Kan. 529, 289 P. 2d 778.) We deem the language of the "Signature Card" portion of the instrument here to be uncertain and ambiguous, and resort must be had to parol evidence in an effort to ascertain the intention of the depositor.

The parol evidence here is scant, to say the least. There was only Hazel's testimony that Charles told the bank officials "to make it in a joint account." In our opinion, the words "joint account" standing alone without further explanation do not imply a true joint tenancy was intended to be established. There was no testimony by any bank official or employee concerning the circumstances surrounding the transaction—such as an explanation to Charles and Hazel of the legal significance of a joint account, or the customary practice of the bank at that time in creating a joint tenancy account. The proof in the instant case falls far short from that in *Edwards v. Ledford,* supra, and *Malone v. Sullivan,* supra. In the latter case all the parties, including the banker, orally agreed that the account should be opened as a joint account with the right of survivorship. The case here is more analogous to *Miller v. Higgins,* supra, which is discussed in detail in the *Edwards* opinion. The finding of the district court that the bank account was not a joint tenancy account

with right of survivorship and that any rights of Hazel to the account terminated at Charles' death must be sustained.

Hazel further asserts the district court erred in holding the executor was entitled to the proceeds of the crops growing on the homestead at the time of Charles' death. Her argument essentially is that the law of this state does not contemplate an executor or administrator is entitled to any part of the homestead, including the growing crops, in opposition to the widow. The appellees, on the other hand, seek to uphold the decision of the lower court by relying on K. S. A. 59-1206, which provides:

"Annual crops, whether severed or not from the land of the decedent at the time of his death, shall be deemed personal assets in the custody of the executor or administrator and shall be inventoried and administered as such."

The precise point apparently has never been decided by this court.

Our homestead laws, although stemming from Article 15, § 9, of the state constitution, embrace not only the constitutional provision but also the various statutes enacted by the legislature for the purpose of carrying the constitution into effect. The homestead clause of the constitution does not in express terms provide any homestead rights after the death of the owner. Even before the enactment of legislation on the subject, this court, by judicial decision, held the homestead retained its exempt nature as long as members of the owner's family continued to dwell thereon after his death (*Cross v. Benson*, 68 Kan. 495, 75 Pac. 558); and by various statutes, culminating with K. S. A. 59-401, the legislature has expressly extended such exemption, upon the death of the owner, to his surviving spouse and children.

Early in our decisions we made clear the legislature could enact legislation extending the homestead right beyond that guaranteed by the constitution, "so long as the extent of the homestead shall be in accordance with sound policy and humanity, and no greater than shall be reasonably necessary to protect the citizens in their pursuits necessary to their existence and well being." (*Cusic v. Douglas and others*, 3 Kan. 123, 133.) The only constitutional limitation was that the legislature could enact no law restricting the homestead right guaranteed by the constitution. (*Towle v. Towle*, 81 Kan. 675, 107 Pac. 228.)

The policy of this state has always been to zealously protect the family rights in homestead property, and this court has liberally construed the constitutional and statutory provisions relating to

homesteads in such manner as to safeguard their humanitarian and sound social and economic purposes. (*State, ex rel., v. Mitchell,* 194 Kan. 463, 399 P. 2d 556; *Watson v. Watson,* 106 Kan. 693, 189 Pac. 949; *Weaver v. Bank,* 76 Kan. 540, 94 Pac. 273; *Cross v. Benson,* supra.) We have said that the surviving spouse and minor children are entitled to the rents and profits from the homestead, such rents and profits being incidents to the right of full occupancy and enjoyment of the premises. (*Campbell v. Durant,* 110 Kan. 30, 202 Pac. 841.) In a similar vein, we held in *Isely Lumber Co. v. Kitch,* 123 Kan. 441, 256 Pac. 133, that annual crops growing on a homestead were exempt from sale on execution against the owner, stating:

". . . The purpose of the homestead exemption is to provide a place in which a debtor and his family may live and to provide a place on which he can raise food for his family without interference by creditors. If crops sown by the occupant of a homestead be levied on and sold while they are growing, one of the purposes of the homestead exemption will be defeated." (p. 444.)

(Also, see, 40 C. J. S., Homesteads § 70b.)

Construing the homestead statute in the liberal manner to which it is entitled, we perceive no valid reason to distinguish the situation here from that in *Isely*. There, a judgment creditor sought to levy against crops growing on the *living owner's* homestead. Here, we have a *surviving spouse* who is, without question, entitled to the homestead exemption extended to her by the statute (59-401). If growing crops are protected by the homestead exemption in the case of the living owner, they should enjoy the same status in the hands of the surviving spouse, who continues to occupy the homestead, to the exclusion of the executor or administrator, free from the claims of creditors.

We are of the view that in spite of the broad provisions of K. S. A. 59-1206, the legislature did not intend the surviving widow occupying the homestead be deprived of crops growing thereon at the time of her husband's death. To hold otherwise would cast serious doubt on the validity of the statute as an effort by the legislature to infringe upon the enjoyment of the homestead right guaranteed by the constitution. A statute should, if reasonably possible, be so construed as to uphold its constitutionality. (*Harris v. Shanahan,* 192 Kan. 629, 390 P. 2d 772.) Although the statute makes no exception to annual crops on the homestead at the date of death, a cursory examination of other statutes in the probate code fortifies our conclusion that growing crops are beyond the reach of the decedent's

personal representative and are not within the purview of the statute. K. S. A. 59-1401 provides the executor or administrator shall have a right to the possession of all property of the decedent *except the homestead* and allowances to the surviving spouse and minor children. In respect to setting apart the homestead and statutory allowances, K. S. A. 59-2235 directs that the property so set apart shall be delivered by the executor or administrator to the persons entitled thereto, and *shall not be treated as assets in his custody.*

Appellees maintain that since heirs and devisees are not entitled to crops growing on the land of the decedent at the time of his death (see, 2 Bartlett's Kansas Probate Law and Practice, § 763 and cases cited therein; Anno. 92 A. L. R. 2d 1373), neither is the surviving spouse claiming the homestead entitled thereto. In view of the sanctity accorded the homestead during the owner's life, and also during its continued existence while occupied by the surviving spouse, the attempted analogy is unfounded.

Our research has disclosed that in *Mahoney v. Nevins,* 190 Mo. 360, 88 S. W. 731, crops growing on the property at the time of the death of the husband were held to belong to the surviving wife under a statute which gave the survivor the right to the exclusive possession of the premises.

For the reasons stated, we hold that Hazel was entitled to the proceeds of the crops growing on the homestead at the time of Charles' death, and the district court's order to the contrary was erroneous.

The judgment of the lower court in respect to the growing crops is reversed, and the remaining portions of the judgment are affirmed.

SCHROEDER, J., dissenting: I respectfully dissent from that portion of the court's decision holding the bank account of Charles W. Johnson and Hazel Johnson to be an account for Charles' convenience and not a joint tenancy account with right of survivorship. The technical niceties required by the court to establish a joint tenancy bank account with right of survivorship, in my opinion, border on the ridiculous in this case.

The contract establishing the account indicates the following:

*First,* the account of Charles W. and Hazel Johnson is titled: "Johnson, Chas W. or Hazel Johnson *or Survivor.*" (Emphasis added.)

*Second,* the "Type of Account" is indicated by an "X" inserted in the box after the word "Joint."

*Third,* a joint account is defined in the instrument itself, using all of the magic words, which clearly discloses the establishment of a joint account with right of survivorship.

Under these circumstances, resort to parol evidence is unwarranted and improper. What the parties intended was a joint tenancy bank account with right of survivorship, and this clearly appears from the instrument creating the account.

Unfortunately, the court's summarization of the "Depositor's Contract and Signature Card" does not give a true picture of the facts upon which to base the decision relative to this point.

On the face of the card in a box at the upper left-hand corner appears the following:

"Depositor's Contract and Signature Card
The Macksville State Bank
Macksville, Kansas
Dated August 1961"

On the face of the card in a box at the upper right-hand corner appears the following:

"Johnson, Chas W. or Hazel Johnson or Survivor
Hopewell, Kansas
Are you a citizen of the United States? *Yes*"

A *double line* then appears across the entire face of the card beneath these two boxes, following which is printed:

"The Bank is authorized to recognize any of the signatures subscribed below in payment of funds or the transaction of any business for this account. Type of Account: Individual ☐  Joint ☒
Partnership ☐  Corporation ☐  (*Check which*)
Remarks:"

Another *double line* then appears across the entire face of the card followed by the area for signatures. It is divided by four horizontal lines and one vertical line in the center, designed to provide six spaces for signatures. The word "Signatures" is written vertically at the left of each set of the spaces for signatures. In two of these spaces appear the signatures "Chas W. Johnson" and "Hazel Johnson."

After the signature spaces, another *double line* appears across the entire face of the card. Then continuing on the face of the card it reads:

"Depositor's Contract
"Collection Clause. In receiving items for deposit or collection, this Bank acts only as depositor's collecting agent and assumes no responsibility beyond the exercise of due care. All items are credited subject to final payment in

cash or solvent credits. This Bank will not be liable for default or negligence of its duly selected correspondents nor for losses in transit, and each correspondent so selected shall not be liable except for its own negligence. This Bank or its correspondents may send items, directly or indirectly, to any bank including the payor, and accept its draft or credit as conditional payment in lieu of cash; it may"

At this point a line is drawn across the entire face of the card, beneath which appears the word "(Over)" and on the reverse side of the card the language continues as follows:

"charge back any item at any time before final payment, whether returned or not, also any item drawn on this Bank not good at close of business on day deposited, and the Bank may at its option refuse payment of check or checks drawn against depositor's uncollected item or items.

"Stop Payment. In case this bank is ordered to stop payment on an item or items, the depositor agrees to hold the Bank harmless for all expenses and costs incurred by the Bank on account of refusing payment of said item, and further agrees not to hold the Bank liable on account of payment contrary to this order if same occur through inadvertence, accident or oversight, or if by reason of such payment other items drawn by the depositor are returned insufficient. Order for stop payment is effective for six months, but renewals may be made from time to time. No stop payment request, renewal or revocation shall be valid unless in writing and served upon the bank.

"Service and Maintenance Charge. It is agreed that this account, whether active or dormant (an account shall be considered dormant when no deposit shall have been made or check drawn or paid for a period of one year), shall be subject to service and maintenance charges heretofore adopted by this Bank and now in effect, and to such charges as may hereafter be adopted by this Bank. New service and maintenance charges and changes in existing charges shall become effective upon the posting of notice in the office of the Bank for a period of ten days or the publication thereof in any local newspaper before the end of said period, or upon giving the depositor not less than ten days' notice in writing mailed to the last address known to the Bank. Such charges may be deducted from the depositor's account and the Bank shall not be liable for dishonoring checks, drafts, notes, acceptances or other instruments because of insufficient funds resulting from the deduction of such charges.

"Joint Accounts. Joint depositors hereby agree each with the other and with the above bank that all sums now on deposit or hereafter deposited by either or both of said joint depositors with said bank to their credit as such joint depositors, with all accumulations thereon, are and shall be owned by them jointly, with right of survivorship, and be subject to the check or receipt of either of them or the survivor of them and payment to or on the check of either or the survivor shall be valid and discharge said bank from liability. Each joint depositor hereby appoints the other attorney, with power to deposit in said joint account moneys of the other, and for that purpose to endorse any check, draft, note or other instrument payable to the order of the other or both of said joint depositors. Payment to or on check of the survivor shall be subject to the laws relating to inheritance and succession taxes and all rules and

regulations made pursuant thereto. The rights or authority of the bank under this agreement shall not be changed or terminated by said depositors or either of them except by written notice to said bank which shall not affect transactions theretofore made.

"Partnership Accounts.  [The agreement concerning Partnership Accounts is set forth at this point.]

"Corporation Accounts.  [The agreement concerning Corporation Accounts is set forth at this point.]

"Mailing Statements.  The bank is authorized to mail statements and cancelled checks to the last address known to the bank.

"The terms of the above contract have been read and are hereby agreed to by owner of account."

At this point a line is drawn across the entire card at the bottom of the reverse side.  It is identical in length to the line drawn at the bottom on the face of the card (where the word "[Over]" appears), except that the line has a space of one-fourth inch at the middle of the card.  The court has made the bold assumption this line was intended to provide space for a second signature of the two depositors.  Nothing, however, indicates that the line in question was intended to require *a second signature* of the depositor or depositors. In fact, if a signature were to be affixed in the space available above the line, it would have to be written in letters no greater than three-sixteenths of an inch in height, whereas the space provided on the face of the card for signatures is three-eighths of an inch in height for each of six signatures.  In my opinion, the format of this document suggests this line was never intended for signatures by the depositors.  It hardly stands to reason that a second set of signatures was contemplated when adequate space for six signatures is specifically provided and designated as such on the face of the card, and at best only half the space is available for two possible signatures on a line indicating the bottom of the card on the reverse side.  The document entitled "Depositor's Contract and Signature Card" was unquestionably designed to provide the signatures on the face of the card to make available the signatures for reference in a card file at the bank.

It is inconceivable to me the parties whose signatures appeared on the face of this card, "Chas W. Johnson" and "Hazel Johnson," failed to agree to the Depositor's Contract.  Could it be said the bank had no agreement with the depositors concerning the collection of items, stop payment matters, service and maintenance charges, or matters relative to the mailing of statements to the parties?  Clearly not.  Both the bank and the parties who estab-

lished this joint account fully understood the Depositor's Contract to be part of the agreement when they placed their signatures on the face of the card. By the same token, the fact they indicated the type of account to be joint invoked the "Joint Accounts" provision set forth in the instrument.

Other considerations fortify this construction of the written instrument. The document is entitled "Depositor's Contract and Signature Card," thus indicating it to be one instrument whereby the parties contract with the bank and also supply their authorized signatures. In fact, the entitlement of the agreement makes reference to the Depositor's Contract before it does to their signatures. The division of the card by *double lines* across its face at three places does not divide the contract by making it four separate parts. Instead, all of the various parts are a portion of one document entitled "Depositor's Contract and Signature Card." It was executed and bound the parties when they affixed their signatures at the place designated on the face of the card. This is confirmed by the fact that above the placement of the parties' signatures, and their indication of the establishment of a joint account, appears the language: "The Bank is authorized to recognize any of the signatures subscribed below *in payment of funds or the transaction of any business for this account.*" (Emphasis added.) By this language the Depositor's Contract is incorporated into the agreement by the signatures they affixed on the face of the card establishing "this account."

It is respectfully submitted the bank account in question is a joint account with right of survivorship, and the lower court should be reversed on this point.