### No. 36,130

In the Matter of the Estate of Harry B. Garden, Deceased (WILA H. GARDEN, *Appellant*, v. ROY A. HAINES and WALTER F. JONES as Executors of the Estate of Harry B. Garden, Deceased, JUNE G. POLLARD, et al., *Appellees*.

(148 P. 2d 745)

Opinion filed May 6, 1944.

*Donald C. Martindell,* of Hutchinson,. and *Robert C. Foulston,* of Wichita, argued the cause, and *William D. P. Carey, Wesley E. Brown, Edwin B. Brabets,* all of Hutchinson, *George Siefkin, Samuel E. Bartlett, George B. Powers, C. H. Morris* and *John F. Eberhardt,* all of Wichita, were on the briefs for the appellant.

*Harold R. Branine* and *Roy C. Davis,* both of Hutchinson, argued the cause, and *Walter F. Jones, Claude E. Chalfant, J. Richards Hunter, Warren H. White, Frank S. Hodge, William H. Vernon* and *Eugene A. White,* all of Hutchinson, were on the briefs for the appellees.

The opinion of the court was delivered by

DAWSON, C. J.: This appeal presents the question whether an appellant was barred of her widow's share of her deceased husband's estate because of an antenuptial agreement. It also presents the related question whether appellant was estopped to claim her widow's share because of her alleged acceptance of certain provisions of a will which the testator had made.

The pertinent facts were these: The late Harry B. Garden was a wealthy citizen of Hutchinson engaged in oil production and related activities. In 1938 he was single, fifty-five years old, and had reared an adopted daughter, Mrs. June G. Pollard. He had been married previously. That marriage had culminated in a divorce in 1937. Early in 1938 Garden met and had become interested in Mrs. Wila H. Waite, a widow, forty-four years of age. She had been reared near Hutchinson, had married a Mr. Percy Waite and resided with him for some years in Denver. He died there in 1930. She took up the sale of life insurance for a livelihood. Later she returned to Hutchinson and became public hostess for that city. In 1938 she owned a third interest in a farm, a house in Denver, and some building and loan stock. She, too, had reared an adopted daughter. In March, 1938, Garden and Mrs. Waite became engaged to be married. Garden so informed his confidential secretary, W. J. O'Connor. The latter reminded him of certain embarrassments Garden had suffered when his first wife was indisposed to co-operate with him in his business dealings. Said O'Connor to Garden, "Now, Harry, you remember your experience with Grace [Garden's former wife]. For your protection, I think you should have some sort of an agreement with Mrs. Waite that would give you a free hand in your operations so that your funds wouldn't be tied up as they were before."

Garden agreed with O'Connor's suggestion and requested him to consider what ought to be included in such an agreement. O'Connor complied. Then Garden directed O'Connor to ask Senator Walter Jones, a lawyer of Hutchinson, to come to Garden's office. Senator Jones came and they explained to him the business difficulties which had troubled Garden during his former marriage, and told him that what was wanted was a simple agreement whereby Garden would have a free hand to conduct his business as he saw fit. Thus instructed, Senator Jones drafted an antenuptial agreement and sent

it to Garden and O'Connor. They familiarized themselves with its terms, and then Garden raised the question, "Do you think Mrs. Waite will sign this agreement?"

O'Connor answered, "Well, I don't know; we can present it to her."

Garden said, "Don't you think you are salesman enough to sell her on this agreement?"

O'Connor answered, "Well, I don't know, Harry. All I can do is to present the facts to her, and if she signs the agreement, all right."

On Garden's invitation Mrs. Waite came to his office the next afternoon, April 30, 1938, and O'Connor and Garden explained the agreement to her and its desirability to facilitate Garden's business operations. This interview lasted about two hours. In Garden's presence O'Connor narrated to Mrs. Waite at considerable length some of the troubles between Garden and his former wife; how she had been privileged to draw checks on Garden's bank account and frequently caused it to be overdrawn. O'Connor showed her over $4,000 in checks she had so drawn in the last few months of 1936, and he showed her enough of such checks drawn by her as "would practically paper the walls in this office." After this lengthy explanation, O'Connor said, "Mrs. Waite, you have all the facts and we have an agreement here which is supposed to give Mr. Garden a free hand to conduct his business as he sees fit."

Mrs. Waite then addressed this question to Garden:

"If I sign this and marry you, does that bar me from your estate?"

Garden said, "It does not. What I want is a free hand to conduct my business as long as I live and what happens after I die makes no difference." Garden then added, "To satisfy you that I don't intend to leave you out of my will, I am going to have a will drawn and even though we aren't married, I am going to include you in my will for one-fourth and this agreement that you are to sign will be made a part of the will and Mr. O'Connor here will hold the agreement until the will is written and the two of them together will be part of each other, and I can't change my will—I can't change this will without your consent."

Garden and Mrs. Waite thereupon signed the agreement, which was dated and acknowledged before O'Connor as notary public, on April 30, 1938. They also had an oral understanding that when Garden's financial statement could be prepared, a copy of it should be appended to the agreement. Within a few days that was done. The statement showed Garden had assets to the amount of $508,-134.69, and liabilities of $46,393.55, thus showing a net worth of $461,741.14 as of March 1, 1938. Also appended to the antenuptial

agreement was Mrs. Waite's statement of her property and financial worth, about $10,000. Garden made his will about the time his financial statement was completed. Mrs. Waite came again to Garden's office and met him and O'Connor there. The three of them went through the will with the same care they had devoted to the explanation of the antenuptial agreement. O'Connor testified that they wanted to show Mrs. Waite that she was included in the will as Garden had agreed. On the same day Garden executed the will.

That will which Garden executed in May, 1938, extends to eight printed pages of the abstract. A short abridgment of its terms will be sufficient here. It devised all his estate to three trustees; Haines, Jones and Mrs. Waite, with the usual powers. Provision was made for many relatives according to their respective needs, and one-fourth of the remainder of the estate was devised and bequeathed to Mrs. Waite, designated as his "intended wife," and three-fourths to Garden's daughter June Garden Preston. Haines, Jones and Mrs. Waite were named as executors, and were to turn the estate over to themselves as trustees when its administration was closed.

Garden and Mrs. Waite were married on June 11, 1938, and took up their abode in one of Garden's properties in Hutchinson. Garden had a life insurance policy for $25,000 dated January 18, 1934. In August, 1940, he procured certain alterations in its terms, whereby the net amount payable thereunder should be paid—"to my wife, Wila Garden, . . . in equal monthly installments of . . . $150.00 . . . in accordance with the provisions of settlement option No. 4,"—the terms of which are of no present concern. The policy also provided for the payment of the policy to other beneficiaries if his wife predeceased him. One provision of the policy read:

"The provisions of this certificate are subject, however, to the condition that in the event written notice of the remarriage of my said wife is furnished to the company at its home office, and any of the beneficiaries above named, other than my said wife are then living, payments to her as provided in this certificate shall cease and payments thereafter shall be made in the same manner as above provided in the event of the death of my said wife before the survivor of the other beneficiaries herein named."

In August, 1941, Garden borrowed from the insurance company the sum of $825.25, which was paid out of the proceeds of the policy after Garden's death.

It would appear that in the years succeeding Garden's marriage

to Mrs. Waite, his business affairs took a turn for the worse, and his private fortune shrank accordingly—a not unusual experience in the hazardous business of an oil producer. In June, 1940, he revoked the will he had made on the eve of his marriage to Mrs. Waite, and made a new will which omitted the provision for his wife contained in the earlier will. The latest will, however, contained the following:

"XI

"On April 30, 1938, I executed an antenuptial agreement with my wife, Wila Garden. This contract is still in force and I do not intend by this will to revoke the same or any of its provisions. However, I have made provision by insurance for the payment to my wife, Wila Garden, of the sum of $150 per month after my death, and for the use of our home so long as she may live and remain unmarried, and I deem these sufficient and adequate provisions for her future.

. . . . . . . . . . . .

"XV

"It is my wish and will that my wife, Wila Garden, shall have the use and occupancy of our home, known as 125 Hyde Park Drive in the city of Hutchinson, Reno County, Kansas, together with all of the furnishings and equipment therein, so long as she may live and remain single. In case she should marry again her right to use and occupy said premises and furnishings and equipment shall end and she shall turn such property over to the trustee, but she shall have the right to take from the premises all of the personal property which she may have purchased herself.

"It shall be the duty of the trustees to pay all insurance, taxes, repairs, upkeep and maintenance on the home place (utility bills are not included), and if there should be any indebtedness against the place at the time of my death the trustees shall out of said trust estate liquidate said indebtedness."

Garden died in January, 1942. His last will was admitted to probate. His widow elected to take under the law and not under the will. She also petitioned the probate court to set aside the antenuptial agreement. The executors Haines and Jones objected; the probate court heard the parties, denied Mrs. Garden's petition, and sustained the antenuptial agreement. She appealed to the district court when the cause was heard *de novo* at length. At the conclusion of the evidence in the widow's behalf the executors interposed a lengthy, argumentative demurrer thereto which the trial court sustained.

On appellant's motion for a new trial certain excluded evidence was introduced. The widow then testified that at the time of the making of the antenuptial contract she did not read it, but relied on the explanation of the contract as made to her; and that she

understood that it did not bar her of all her rights of inheritance in Garden's estate. On motion of defendants' counsel to strike out this testimony, the record reads:

"The Court: Well, it is still a question of whether or not it was a part of the transaction, and I will have to agree with—it seems to me that it is. We get down to what actually happened at the time the transaction was entered into, the actual details of that; it is a part of the transaction. . . ."

In this appeal Garden's widow assigns error on the trial court's ruling on defendants' demurrer to her evidence, in overruling her motion for a new trial, and in dismissing her appeal from the decision of the probate court.

We shall use no space to discuss the general subject of antenuptial contracts. Where they are fairly and understandingly made, and just and equitable in their provisions, and free from fraud and deceit, they are valid and enforceable. (*McVicar v. McVicar*, 128 Kan. 394, 399, 278 Pac. 36; *Pattison v. Pattison*, 129 Kan. 558, 561, 562, 283 Pac. 483; *Dunsworth v. Dunsworth*, 148 Kan. 347, 352, 81 P. 2d 9; *In re Estate of Cantrell*, 154 Kan. 546, 119 P. 2d 483.)

Such contracts between affianced spouses are not judicially regarded as ordinary contracts between persons dealing with each other at arms' length. Persons engaged to marry have or should have such confidential relationship towards each other that each has the duty to deal with the other with the utmost fairness, candor and sincerity; and in the case at bar we are met at once with the question whether Garden dealt with his affianced wife in harmony with that standard of conduct. It is not enough to dispose of this question to say that the antenuptial instrument speaks for itself. It was competent and proper to show the circumstances under which Garden brought her to his office; how he and O'Connor explained to her the need of such a contract so that he would be free to deal with his varied business activities as he should see fit without the possibility of a recurrence of the embarrassments he had suffered by the noncoöperative attitude of his former wife. The appellant, having that implicit trust and confidence which an affianced spouse ought to have in the representations of her betrothed husband, as well as those made by his agent and confidential secretary in the presence of the betrothed husband, asked but one question: "If I sign this and marry you, does that bar me from your estate?"

To that question Garden answered, "It does not."

To emphasize his answer and give her added assurance, Garden

reiterated the lengthy explanation already made to Mrs. Waite by O'Connor that the antenuptial agreement was merely to facilitate Garden's extensive business operations, which as an oil producer had to be promptly dispatched without being hindered by the necessity of consulting a wife or getting her approval or signature to his transactions. And to further emphasize his answer and to assure her that her signature would not bar her from his estate, he informed her of his intention to include her in his will for one-fourth of his estate, and that O'Connor would hold the antenuptial agreement until his will was written, and that the two instruments together— the antenuptial agreement and the will—would be parts of each other, not to be changed without her consent.

Tested by defendants' demurrer, the evidentiary incidents summarized above, gleaned chiefly from O'Connor's testimony, must be taken as true. Here there was not only O'Connor's seemingly candid narrative of the circumstances which led to the signing of the antenuptial contract and the making of the will, but the evidence inherent in the instruments themselves was probative of the fact that they were intended to be complementary parts of the same contract. Considered separately and without reference to each other, and without consideration of the circumstances under which the appellant signed the antenuptial contract, as the defendant executors would have us do, some pertinent but unanswerable questions would force themselves on our attention. What did Mrs. Waite get out of the antenuptial pact by her signature thereto? Read by itself the antenuptial instrument gave her nothing. Was she merely inveigled into coming to Garden's office to listen to O'Connor and Garden for two hours about the domestic difficulties Garden had suffered because of his former wife's financial improvidence only to excite her sympathy and thus induce her to sign the pact he had prepared? Either the representations and assurances of Garden and his confidential secretary were made in good faith and entitled to the credence appellant gave them, or their lengthy expositions of its desirability to facilitate Garden's business dealings were only a "selling talk" intended to defraud her into an unqualified renunciation of all her marital interest in her affianced husband's estate? And when Garden had her come to his office a few days later, and he and his confidential secretary went over the will he had caused to be drafted in the interim, and explained its terms to her with the same care they had done on

the previous occasion, was that second interview with its extended explanations no more than a continuance of the "selling talk" which had induced her to sign the antenuptial instrument?

There is ample authority for the rule of law that where two instruments are executed at or near the same time, and which deal with related interests of the parties concerned, the two instruments may and frequently must be construed as complementary parts of one entire contract and are to be judicially dealt with accordingly. In *MacLorinan v. Finley*, 124 Kan. 637, 261 Pac. 587, the controlling question was whether a warranty deed of certain land to a grantee and a separate instrument executed twenty days later reconveying "all the oil and gas" under the land to the grantor, should be considered as complementary parts of one entire contract. Neither instrument contained any reference to the other. On parol testimony and other extraneous evidence, the trial court so held. On appeal it was said:

"[Defendants] rely on the unqualified recitals of their deed of general warranty . . . [they] invoke the rule which forbids the introduction of parol testimony or other extraneous facts or circumstances to qualify, impair, alter or impeach the plain and unequivocal terms of a written instrument . . .. Such contention is well enough in its way, but here the warranty deed from Perkins to the Finleys was only a part of the writings which evidenced the contract of the parties. The complemental instrument executed reciprocally by the Finleys granting and confirming to Perkins the oil and gas rights was just as much a part of the same contract and just as immune from impairment, alteration or impeachment as the deed from Perkins on which the defendants so confidently rely. The written agreement for the purchase and sale of the half section, and the Perkins deed to Mrs. Finley, and the reconveyance of the gas and oil rights to Perkins should be considered as integral parts of a single transaction so far as determining the respective interests of the parties in this land is concerned. All this is settled law. (Citations.)

"Nor does the fact that the complemental instruments do not in terms refer to each other detract from their significance as integral and related parts of one contract. (*Houck v. Frisbee*, 66 Mo. App. 16; *Advertising Co. v. Publishing Co.*, 146 Mo. App. 90; 13 C. J. 528), . . . Abundant competent evidence was adduced to show that the contract for purchase and sale dated January 25, 1919, the deed of February 5, 1919, and the reconveyance of the oil and gas rights dated February 21, 1919, were all pertinent parts of a single transaction." (pp. 639, 640.)

In *Setchell v. Reed*, 153 Kan. 818, 113 P. 2d 1050, two instruments, although executed fifteen days apart, were held to be integral parts of a single contract.

See, also, *Skinner v. Skinner*, 126 Kan. 601, 605, 606, 270 Pac. 594. and citations.

Moreover, the circumstances under which such complementary instruments have been executed can be shown by parol evidence. Thus in *Insurance Co. v. Hanks*, 83 Kan. 96, 110 Pac. 99, where objection was made to testimony adduced to show that two separately written instruments constituted parts of the same transaction, Mr. Justice Benson, speaking for this court, said:

"It is urged that as the release upon its face purports to be complete, parol evidence cannot be allowed to extend its obligations. This rule, however, does not apply where the parol evidence is offered merely to prove another contemporaneous written contract, which with the release constitutes the agreement. All contemporaneous writings relating to the same subject matter are admissible to show the entire agreement. (1 Greenl. Ev., 16th ed., §§ 277-283; *Wilson et al. v. Randall,* 67 N. Y. 338.)" (p. 103.)

In *Roseman v. Nienaber*, 100 Kan. 174, 166 Pac. 491, it was held:

"Parol evidence as to the true consideration for the deed, as to the situation of the parties, and as to the circumstances under which the instruments were executed, was admissible." (Syl. ¶ 2.)

This rule of evidence is universally applied to show the circumstances under which a will is executed (*Protheroe v. Davis,* 149 Kan. 720, 89 P. 2d 890) and to show the testator's motives which prompted the making of the will. (*Wisner v. Chandler,* 95 Kan. 36, 147 Pac. 849.) No different rule could justly exclude probative evidence to show the circumstances and motives of the parties concerned in the making of an antenuptial agreement. Our own decisions emphatically declare that prerequisites to the validity of an antenuptial contract are that it be understandingly and fairly made, free from deceit or fraud, and that it be just in its provisions considering the circumstances of the parties at the time it is made. (*Pattison v. Pattison,* supra; *Dunsworth v. Dunsworth,* supra.)

In view of the evidence in the case at bar, which must be accepted as true against appellees' demurrer, how can it be judicially declared that the antenuptial contract in the case at bar was understandingly or fairly made, when the appellant signed it on Garden's assurance that it did not bar her of her share in his estate? Where is the requisite essential element of fairness in this antenuptial contract which stripped her completely of every interest in Garden's estate unless the will which Garden promised to make and did make is considered as a part of the antenuptial compact between the parties? And while a disproportion or seeming inadequacy of the amount the affianced bride is to receive out of her affianced husband's estate is not alone controlling, it is a circumstance to be considered with all

the other evidence to determine whether she was fairly dealt with. (*In re Estate of Cantrell,* supra.)

Assuming that Garden's representations and assurances to his betrothed were made in good faith, but that he believed he could change his will after the marriage, then certainly the antenuptial pact was not understandingly made—even by Garden himself. If Garden believed he had a right to alter his will after his marriage without his wife's consent, and cut her off without the devise he had made to her in his prenuptial will, then certainly he perpetrated a fraud on her when he assured her to the contrary in order to obtain her signature to the antenuptial contract.

We have already said that when affianced spouses enter into an antenuptial pact they do not deal with each other at arms' length. Counsel for appellees say that appellant was a trained business woman and quite capable to be her own adviser. She was, indeed, a trained insurance solicitor, which probably served her in good stead when she came to consider whether her right as beneficiary of Garden's insurance policy had any bearing upon her statutory right as Garden's wife under the later will which was admitted to probate. There was neither evidence nor admission that her business training had skilled her in the analysis of antenuptial agreements.

When the later will was admitted to probate, appellant informed the probate court that she elected to take her statutory right as Garden's widow (G. S. 1943 Supp. 59-504), and not under the will. That was her privilege. Counsel for defendants urge that she was estopped to do so, because she herself offered the will for probate. If the will was in her possession or available to her, it was her duty not to withhold it. (G. S. 1943 Supp. 59-618; id. 59-2221.) The widow's right of election to take under the law and not under the will follows the probate of the will. So reads the statute. (G. S. 1943 Supp. 59-2233; *In re Estate of Hoover,* 156 Kan. 31, 36, 131 P. 2d 917.) Nor did her qualification and service as executrix for a time under the will estop her to assert her statutory interest in the estate. The mere fact that a person has a claim against an estate does not disqualify him to serve as executor or administrator, although, of course, he cannot serve in such capacity when his own claim is up for consideration. In *Tomb v. Bardo,* 153 Kan. 766, 114 P. 2d 320, we held that a widow's election to take under the law and not under her deceased husband's will did not preclude her from acting as executrix.

In *Dick v. Taylor*, 124 Kan. 646, 261 Pac. 579, this identical question was before this court, where we held:

"The widow was not estopped from seeking a revocation of her election to take under the will because of having been named executrix under the will and having qualified and acted thereunder." (Syl. ¶ 3.)

Furthermore, a widow must be fully informed as to her rights under the law and likewise under the will before she is required to elect (*Dick v. Taylor*, supra), otherwise her election will be set aside. (*Williams v. Sechler*, 127 Kan. 314, 273 Pac. 447.) She cannot be held to have waived her widow's right upon mere inference, but only upon her plain and unequivocal assent and upon full knowledge of her rights and the condition of the estate. (*Sill v. Sill*, 31 Kan. 248, 1 Pac. 556; *Williams v. Sechler*, supra.)

Defendants contend, however, that she did accept the provisions of the will in her behalf respecting the $25,000 insurance policy on Garden's life wherein she was named as beneficiary under its terms summarized above, and likewise because she has continued to occupy the Garden homestead under the terms of the will. That contention is clearly untenable. The insurance policy was a contract between the insurance company and Garden, the assured, with Mrs. Garden as the named beneficiary, and was complete in itself. It did not pretend to relate to the antenuptial agreement, nor to the beneficiary's statutory rights of inheritance as widow if she survived her husband. That insurance policy was no part of Garden's estate nor disposable by his will. Any alteration of its terms which Garden might have wished to make in his lifetime would have required the assent of the insurance company. The fact that in his will he refers to his antenuptial agreement of 1938, wherein he declared it was still in effect, did not alter the relations of the insurer, insured, and beneficiary in the slightest degree. The policy had named Mrs. Garden as beneficiary, and her acceptance of insurance payments as such beneficiary under the policy did not estop her to assert her statutory right to one-half of her husband's estate. Garden's insurance policy contained no provision authorizing him to make a testamentary change of beneficiary, so when he died Mrs. Garden, the named beneficiary, had a vested interest in the policy, and it was due and payable to her immediately upon Garden's death, irrespective of his futile effort to make a testamentary disposition of its proceeds. (*Wannamaker et al. v. Stroman et al.*, 167 S. C. 484, 166 S. E. 621.) *Parks' Ex'r v. Parks*, 288 Ky. 435, 156 S. W. 2d 480,

deals with this subject at some length, but we can only take space to quote one headnote. It reads,

"Generally, a change in the beneficiary of an insurance policy cannot be made by insured's will where policy prescribes method of changing beneficiaries." (¶ 12.)

See, also, Anno.—Wills—Election, 110 A. L. R. 1317, 1319, et seq.

In Aten v. Tobias, 114 Kan. 646, 653, 220 Pac. 196, the widow elected to take under her husband's will which devised to her the family homestead of 320 acres which was already hers. In such case, of course, she accepted the provision for her in the will, and thereby waived her independent right and title to the homestead. If she had elected to take under the law, she would have kept her 320-acre homestead, which was no part of her husband's' estate, and would have gotten one-half of all her husband's estate—exactly as Mrs. Garden was entitled to accept and enjoy her interest as beneficiary of the insurance policy which was no part of her husband's estate, without estopping herself to claim her statutory right of inheriting one-half his estate. We have not failed to read *Haywood v. Haywood,* 225 N. Y. S. 84. It may be superficially like the case at bar, but we think it is readily distinguishable from the one now before us. In any event we would prefer to follow the Wannamaker case, *supra,* and the Parks case, *supra,* rather than the Haywood case, if we were compelled to choose between them.

And surely at this late date it scarcely needs to be elaborated that the fact that the widow continues to occupy the family homestead does not bar her right as statutory heir of her husband. True, she continues to occupy it; but this is because the law gives her that right, not because the will gives it to her. In *Watson v. Watson,* 106 Kan. 693, 189 Pac. 940, it was held:

"The restrictions of the constitution and statutes touching the alienation of a homestead are for the protection of the family, and cannot be varied or avoided by an antenuptial contract providing that in case the wife survives the husband she is to have no part in his estate. Hence, so long as such surviving widow remains unmarried she may occupy the homestead regardless of such contract." (Syl.)

See, also, *Breen v. Breen,* 102 Kan. 766, 173 Pac. 2; *Burns v. Spiker,* 109 Kan. 22, 28-29, 202 Pac. 370; and *Hoard v. Jones,* 119 Kan. 138, 152, 237 Pac. 888.

Appellant complains because of the exclusion of her proffered testimony that she relied on Garden's explanation of the antenuptial contract, and that she did not understand it would bar her

right of inheritance, and that she would not have signed it if she had known it would bar her of all rights of inheritance. As we read the trial court's ruling this evidence was not excluded in toto. We discern no prejudicial error here. Moreover, it needed no parol testimony by appellant to establish her reliance on Garden's and O'Connor's statements, explanations and assurances when she signed the antenuptial pact. That would be presumed. Furthermore, the testimony of O'Connor and the evidence inherent in the circumstances were quite sufficient to prove that she did rely on what was told her. Hitherto this court has not rigidly held that the admission of such testimony constitutes prejudicial error. (*Collins v. Hayden*, 104 Kan. 351, 179 Pac. 308, and citations; *Gaston v. Clabaugh*, 106 Kan. 160, 186 Pac. 1023.) And the latest textbooks and law journals urge that the rule of its inadmissibility be abrogated altogether. See A. L. I. Model Code of Evidence, Rule 101, pp. 91-99; 9 Kan. Bar Journal (Nov., 1940) 170 *et seq.;* 10 id. (Nov., 1941) 143 *et seq.*

Noting briefly other matters mentioned in the briefs of counsel, it was the proper practice for appellant to petition the probate court, under its present enlarged equitable jurisdiction, to set aside the antenuptial agreement (*In re Estate of Grindrod*, ante, p. 345, 148 P. 2d 278); and as against a demurrer, her evidence was sufficient to support her petition, and that court or the district court on appeal should have so held.

The disparity between Garden's fortune or estate and that of his affianced wife was not a controlling incident, but it is of some evidentiary value, to be taken into account in considering the fairness of the antenuptial pact, even if it had given her something substantial out of her husband's riches, which, of course, it did not do unless the contemporary antenuptial will is considered as an essential part of the pact. (*In re Estate of Cantrell*, supra.)

It is sheer begging the question for appellees to argue that when this court has put its stamp of approval on a form of antenuptial agreement as we did in *McVicar v. McVicar*, supra, lawyers and litigants are entitled to rely on it. They are so entitled, indeed, but the lawyer-like excellence of that antenuptial contract will not help a bad cause nor an ill-founded defense. There was no semblance of want of fairness in the McVicar case, no want of understanding, no misleading misrepresentation of its legal effect, no complementary will or other related instrument to be considered, no administrator's

or executor's problems to perplex a probate court. It presented merely the legal question between the son of the deceased Mr. McVicar and his stepmother, whether the antenuptial instrument as it stood was sufficient to permit the son to quiet title to some Pottawatomie land inherited from his father, who spent his later years and died a resident citizen of California.

The other matters urged in support of the trial court's judgment as well as those opposed to it have all been patiently considered but need no further discussion. The judgment of the district court must be reversed and the cause remanded with instructions to overrule the demurrer to plaintiff's evidence and for further proceedings consistent with this opinion. It is so ordered.