No. 115,416

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RAIL LOGISTICS, L.C., *et al.*,
*Appellees*,

v.

COLD TRAIN, L.L.C., *et al.*, (CHRISTOPHER MNICHOWSKI),
*Appellants*.

SYLLABUS BY THE COURT

1.

In ruling on a motion for judgment as a matter of law under K.S.A. 2016 Supp. 60-250(a)(1), the court must resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom the ruling is sought. When reasonable minds could reach different conclusions based on the evidence, the court must deny the motion. The issue is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party. An appellate court applies these same standards in its de novo review.

2.

Courts consider written documents jointly when they are executed contemporaneously by the same parties. The fact that complementary instruments do not refer to each other does not necessarily detract from their significance as integral and related parts of one contract. When a court construes instruments together, the general purpose of the entire transaction controls.

1

3.

The court's purpose in construing a contract is to ascertain the intent of the parties, and such intent best may be determined by looking at the language employed and taking into consideration all the circumstances and conditions which confronted the parties when they made the contract.

4.

When a court is called on to interpret multiple interrelated documents, not all of which were signed by the same parties, the court can read and construe them together because of their interrelated nature and because the true nature and character of a document is not determined by the name attached to it but by the intent of the parties as reflected by its terms and content.

5.

Under Supreme Court Rule 6.05 (2017 Kan. S. Ct. R. 36) an appellant may not raise new issues in a reply brief.

6.

Constructive fraud is the breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence. Neither actual dishonesty nor purpose or intent to deceive is necessary to establish constructive fraud.

7.

In order to be successful on a claim of constructive fraud, the plaintiff must show (1) a confidential relationship and (2) a betrayal of a confidence or breach of a duty imposed by the relationship.

8.

A confidential or fiduciary relationship refers to any relationship of blood, business, friendship, or association in which one party reposes special trust and confidence in the other party who is in a position to have and to exercise influence over the first party.

9.

As a general rule, fiduciary relationships either are created by contract or by formal legal proceedings or they are implied in law due to the facts surrounding the transactions and the relationship of the parties to the transactions.

10.

A fiduciary relationship is characterized by a peculiar confidence placed by one individual in another. A fiduciary is one who is in a position to have and exercise, and does have and exercise, influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Thus, a fiduciary relationship generally implies that one party is weaker than the other, either in business intelligence, knowledge of facts, or mental strength, thereby giving the other party an advantage. Generally, in a fiduciary relationship, the property, interest, or authority of the other party is placed in the charge of the fiduciary. Thus, a fiduciary has the duty to act primarily for the benefit of the other party.

Appeal from Johnson District Court; JAMES F. VANO, judge. Opinion filed May 26, 2017. Affirmed in part and reversed in part.

*Luke R. Hertenstein*, of Foland, Wickens, Eisfelder, Roper & Hofer, P.C., of Kansas City, Missouri, for appellants.

*Mick Lerner*, of The Lerner Law Firm, P.A., of Overland Park, for appellees.

3

Before STANDRIDGE, P.J., MCANANY, J., and HEBERT, S.J.

MCANANY, J.: Michael Lerner and Christopher Mnichowski were co-managers of Rail Logistics, L.C., and Cold Train, L.L.C., but they had a falling-out and decided to end their relationship. The details of the steps they would take to end their relationship and to divide the ownership of these companies were memorialized in three written agreements: an exchange agreement, a promissory note, and a pledge agreement. The end result was that Lerner became the sole owner of Rail and Mnichowski became the sole owner of Cold Train.

Thereafter, Rail brought this action against Cold Train and Mnichowski, asserting claims that include breach of contract and constructive fraud. Following a jury trial, judgment was entered against Mnichowski for two counts of breach of contract and for constructive fraud. Rail was awarded damages of $375,091. Mnichowski appeals, claiming there was insufficient evidence to support these claims, that the court erred in instructing the jury on them, and that the court erred in not entering judgment as a matter of law on them.

We conclude that the district court did not err in its rulings or in its instructions on the contract claims, for which there was sufficient evidence to support the jury's findings, but that the court erred in allowing the claim of constructive fraud to go to the jury because there was no showing of a relationship of trust and confidence between the parties.

*Facts*

Lerner and Mnichowski were joint owners and active co-managers of Rail and Cold Train. Rail originally was formed as a limited liability company in 1998, with Lerner as its sole managing member. Rail's business was manufacturing special purpose

rail cars, leasing rail cars to third parties, and providing logistic services to third parties with fleets of rail cars. In 2009, Mnichowski became a co-managing member of Rail. At that time, Lerner owned two-thirds and Mnichowski owned one-third of Rail.

Cold Train was formed as a limited liability company in 2009 with Lerner and Mnichowski equal owners and co-managers of the company. Cold Train is in the refrigerator intermodal business. It transports refrigerated containers from trains to its customers and then returns the refrigerated containers to the trains.

In 2010, Mnichowski proposed to Lerner that they start their own trucking company in order to provide Cold Train with better trucking rates and to provide better service to customers. Lerner was not interested, so Mnichowski formed the trucking company, CT Cartage, and agreed with Lerner that the new company would not do business with Cold Train.

In the fall of 2010, Lerner found out that CT Cartage was doing business with Cold Train. As a result, he felt he could no longer rely on Mnichowski, so he proposed that they divide up the ownership of Rail and Cold Train with Lerner taking Rail and Mnichowski taking Cold Train.

On December 17, 2010, Lerner and Mnichowski entered into three written agreements—an exchange agreement, a promissory note, and a pledge agreement—to end their joint ownership of Rail and Cold Train.

- ■ EXCHANGE AGREEMENT—Under the exchange agreement, Mnichowski became the owner of Cold Train and Lerner became the owner of Rail. The agreement provided that Mnichowski relinquish to Lerner his interest in Rail, resign from all positions with Rail, and agree to other related terms. In exchange,

5

Lerner relinquished to Mnichowski his interest in Cold Train and resigned from all positions with Cold Train.

Rail had a contract with the Burlington Northern Santa Fe Railroad (BNSF) it had entered into in 2009. (We will discuss that contract below regarding the pledge agreement.) Rail apparently had not engaged in the intermodal services provided for in the contract. Under the exchange agreement Rail agreed to assign the BNSF contract to Cold Train.

Rail agreed to loan Cold Train $320,000 in the form of a line of credit line for Cold Train's "working capital, day-to-day needs, [and] cash needs." Cold Train agreed to repay this credit line along with the promissory note described below.

As part of the exchange agreement, Cold Train agreed that so long as it remained indebted to Rail (see also the promissory note below), it would provide monthly financial statements to Rail, including a balance sheet and an income statement.

■ PROMISSORY NOTE—The 2-year promissory note (signed by Cold Train but not personally by Mnichowski) was for $1,413,396.17. It was given to Rail and was secured by a pledge of Cold Train's assets.

As of December 17, 2010, Cold Train owed Rail between $1.5 million and $2 million, an amount in excess of the value of Cold Train's receivables. As a part of dividing the ownership of these two companies, the parties agreed that Rail would convert part of the debt into a 2-year loan evidenced by this promissory note. The note covered (1) Cold Train's obligations to Rail, accumulated during the time Lerner and Mnichowski jointly owned Cold Train, (2) the unpaid charges for refrigerated containers Cold Train leased from Rail, and (3) certain start-up operating expenses Rail paid for Cold Train.

6

Under the terms of the promissory note, Cold Train's failure to perform any obligation under the exchange agreement or the pledge agreement would constitute a default of the note.

- PLEDGE AGREEMENT—The pledge agreement, entered into at the same time as the promissory note, prohibited Mnichowski from taking any action which would impair the position or interest of Rail in the pledged collateral without obtaining Rail's prior written consent. Thus, Mnichowski agreed not to sell, assign, transfer, pledge, or otherwise encumber any of the collateral securing Cold Train's promissory note without Rail's permission until the note was paid in full.

  Cold Train's assets included about $1 million in accounts receivable and the exclusive 5-year BNSF contract, mentioned earlier, to provide intermodal rail service in refrigerated cars. The BNSF contract was the only contract of its kind in the United States and was worth millions of dollars. It gave Cold Train the exclusive right to use shipping refrigerated containers on railroad cars. Cold Train was the only business that used the intermodal rail service after the split and the assignment of the BNSF contract to Cold Train. Rail's business was different from that of Cold Train, and Rail did not have use for the BNSF contract except as collateral for Cold Train's debt.

  These assets were supposed to be retained by Cold Train, free of any encumbrance, until the debts to Rail were fully paid. If the pledge agreement was violated, Rail was entitled to take immediate ownership of Cold Train from Mnichowski.

These three written documents were interconnected, with each document referencing the other two. Under the terms of the promissory note, Cold Train's failure to observe or perform any agreement under the exchange agreement or the pledge

7

agreement constitutes an event of default. The promissory note states that the pledge agreement is intended to secure the payment of the promissory note with Mnichowski's interest in Cold Train. The execution of the promissory note and the pledge agreement was stated to be a condition for the closing of the exchange agreement, and the exchange agreement expressly refers to them as "transactions under this Agreement."

In February 2011, after the division of Rail and Cold Train, Mnichowski negotiated with BNSF for a contract in the name of Cold Train Intermodal, Inc., one of the companies he would later own. BNSF required a letter of credit as a condition of a contract with Cold Train Intermodal, Inc. In order to obtain that letter of credit, Mnichowski pledged Cold Train's assets, thereby encumbering Cold Train's assets in violation of the pledge agreement with Rail. (Mnichowski later stipulated in this case to these facts and admitted that this act was a violation of the pledge agreement.)

On September 30, 2011, Rail sued Cold Train, Mnichowski, CT Cartage, Inc., Cold Train Intermodal, Inc., CM Financial Group, Inc., and CMF Leasing, Inc., for a restraining order and other injunctive relief; for the appointment of a receiver for Cold Train; and for a declaratory judgment, specific performance, and damages. The district court issued a temporary restraining order which prohibited Mnichowski and Cold Train from transferring or encumbering any other assets of Cold Train, including cash, and which otherwise maintained the status quo pending a temporary injunction hearing.

The following day, Rail notified Mnichowski that it was exercising its right under the pledge agreement to take over Cold Train and to terminate Mnichowski as an officer of Cold Train. In subsequent court filings and in his deposition, Mnichowski acknowledged Rail's take-over of Cold Train as provided for in the pledge agreement.

At the time of trial in August 2016, Rail had control of Cold Train and had assumed all of Cold Train's obligations. A lengthy stipulation containing many of the

8

facts recited above was read at trial to the jury. In the stipulation, the parties stated that certain agreements were made in writing "to accomplish the termination of the joint ownerships." Lerner testified that the three agreements—the exchange agreement, the promissory note, and the pledge agreement—were intended to be considered jointly.

Steve Lawson, vice-president of intermodal operations for Cold Train before this suit, testified about a meeting he had with Mnichowski on April 8, 2011. Mnichowski told Lawson that "he was in a Machiavellian plan to strip" Cold Train of its assets. Mnichowski planned to leave Cold Train with no assets to pay off the $1,413,396.17 promissory note and with about $2 million in debts to suppliers. By that time all the assets would be gone. Mnichowski said he had already set up a new contract between BNSF and Cold Train Intermodal, Inc., and he planned to transfer Cold Train's customers and equipment to Cold Train Intermodal, Inc.

> "[Mnichowski] said he was going to move [Cold Train's assets] into a new entity, and he was going to leave Cold Train, LLC, a shell that had nothing but a million four in debt to Rail Logistics, another $300,000 credit line that was offered by Rail Logistics, and some various vendor debt that would have been left, somewhere probably two million dollars."

In response, Lawson asked Mnichowski if he thought Lerner "would take a multi-million dollar ass-whipping lying down." When asked what that meant, Lawson stated that Mnichowski's plan effectively "would be stealing. If you're going to leave a shell that can't pay [its] bills and can't repay a debt owed to Rail Logistics, it's going to be theft." This April 8, 2011, conversation was so shocking to Lawson that he made a written record of it.

In a prior hearing, Mnichowski had admitted that it was possible that he had the meeting with Lawson on April 8, 2011. Mnichowski said he did not recall using the word

9

"Machiavellian," but he had used the word in the past, and he understood the word to mean "a plot." This admission was read to the jury at trial.

Lawson testified that on several occasions after the April 8, 2011, meeting, Mnichowski asked him to help move customers from Cold Train to Cold Train Intermodal, Inc., but Lawson refused. On one occasion, Mnichowski told Lawson he was going to talk to his attorney about bankrupting Cold Train. Lawson testified that Cold Train was "very slow paying vendors," and suppliers often called to complain about not being paid.

In 2011, right after Mnichowski took over Cold Train, Cold Train began paying management fees to one of Mnichowski's other companies, CM Financial Group, Inc. Lerner testified that in the first 2 weeks after the agreements were signed, Cold Train started paying management fees three times larger than the amount it previously paid. They totaled over $489,000 that year. Though the number of Cold Train employees decreased by about half after Mnichowski took over, the management fees drastically increased in 2011. Lerner was concerned about the amount of these fees. He suspected that Mnichowski was stripping Cold Train of its assets.

> "Well, it's nothing out of the ordinary to pay a management fee to a third party company. But it is questionable to strip money from a company. That's used frequently by swindlers. It's called a bust-out scheme, where they would just take money out of the company, not pay debts, and call them a number of things like management fees. So, it concerned me when I found out that the amount of the management fees that were taken from Cold Train, and given to Mr. Mnichowski's other companies."

Mnichowski also began extracting from Cold Train a transaction fee of $25 for each shipment that used CT Cartage, Inc., one of his other companies. There were over 1,400 such fees paid in the 10 months between November 30, 2010, and September 30, 2011. These fees had not been charged before the split between Rail and Cold Train.

Before the Rail/Cold Train split, Cold Train had not made loans to other companies. After Mnichowski took over Cold Train, he began making loans from Cold Train to himself and to other companies Mnichowski owned. For example, Cold Train loaned (1) $10,000 to Mnichowski, individually; (2) $244,228.93 to CM Financial Group; (3) $136,367.30 to CT Cartage, Inc.; (4) $42,000 to CMF Leasing, Inc.; and (5) $67,204 to Heartland Motor Coach, Inc., a bus company in which Mnichowski owned a substantial interest.

Rail learned about these loans and other transfers of Cold Train assets to Mnichowski and his companies after Rail took over Cold Train pursuant to the district court's order in this suit. Before then, Mnichowski had not provided the monthly financial statements to Rail that he was required to provide under the terms of the exchange agreement, thereby concealing from Rail these loans and other transfers.

The jury found in favor of Rail and against Mnichowski on four of its theories: (1) Mnichowski breached the separation agreements with respect to the $1,413,396.17 loan; (2) Mnichowski breached the separation agreements with respect to the $320,000 loan; (3) Mnichowski committed fraud by silence during the time he was supposed to submit Cold Train's financial statements to Rail; and (4) Mnichowski engaged in constructive fraud against Rail by transferring away valuable assets of Cold Train. The jury found in favor of Mnichowski and CM Financial Group, Inc., on Rail's other claims.

The jury awarded damages to Rail as follows: (1) $117,783.02 for breach of the separation agreements with respect to the $1,413,396.17 loan; (2) $247,308.41 for beach of the separation agreements with respect to the $320,000 loan; (3) no damages for Mnichowski's fraud by silence; and (4) $10,000 for constructive fraud.

Mnichowski's posttrial motions were denied, and his appeal brings the matter to us. He raises on appeal nine different points of error. With respect to the $1,413,396.17

11

loan, the $320,000 loan, and the claim of constructive fraud, he argues that the district court should have granted judgment as a matter of law on each of those claims, that the court erred in instructing the jury on each of them, and that the evidence was insufficient to support the jury verdict on each of them. While his arguments on these claims for the most part are repetitive, we will consider each in order.

### *$1,413,396.17 Loan—Judgment as a Matter of Law*

Mnichowski asserts that the district court erred in denying motions for judgment as a matter of law on Rail's breach of contract claim related to the promissory note. He argued to the district court that (1) he was not personally liable on the promissory note; and (2) the remedy for breach was the return of Cold Train to Rail, which happened before trial. These motions were denied at the close of the plaintiffs' case, at the conclusion of all of the evidence, and in posttrial motions.

Under K.S.A. 2016 Supp. 60-250(a)(1), if a party has been fully heard on an issue during a jury trial, and there is no legally sufficient evidentiary basis for the jury to find for the party on the issue, the court may: "(A) Resolve the issue against the party; and (B) grant a motion for a judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."

In ruling on a motion for judgment as a matter of law, "[t]he question is not whether there is literally no evidence supporting the party against whom the motion is directed, but whether there is evidence upon which the jury could properly find a verdict for that party." *Sampson v. Hunt*, 233 Kan. 572, 578, 665 P.2d 743 (1983). In deciding the motion, the court must resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom the ruling is sought. When reasonable minds could reach different conclusions based on the evidence, the court must deny the motion.

12

*National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 267, 225 P.3d 707 (2010); *Michaelis v. Farrell*, 48 Kan. App. 2d 624, 629, 296 P.3d 439 (2013). On appeal, we apply this same standard in our de novo review. *Michaelis*, 48 Kan. App. 2d at 629.

Mnichowski admits that he violated the pledge agreement by encumbering the assets of Cold Train. But he contends he was not personally liable on the promissory note itself, so he could not be liable in damages for its breach.

In the contentions instruction, Jury Instruction No. 12, Rail claimed:

"That, with respect to the $1,413,396.17 loan, Defendant Mnichowski breached the separation agreements reached with plaintiffs in December of 2010, namely, the Exchange Agreement, the Pledge Agreement, and the Promissory Note, considered jointly, by encumbering the assets of Cold Train, L.L.C., and by transferring away from Cold Train, L.L.C., to himself and to other defendants, its valuable assets."

Mnichowski's argument is based on the premise that the exchange agreement, the promissory note, and the pledge agreement were separate and distinct from each other. He asserts that although the breach of contract claims "make reference to the three separate contracts being 'considered jointly,' it is clear from the express terms of these three documents that they are separate contracts." While the three agreements reference each other, Mnichowski argues that no clause in any of them expressly incorporates the terms of the others. But Kansas law does not require that the documents expressly incorporate each other, and Mnichowski provides no support for his assertion to the contrary.

We consider written documents jointly when they are executed contemporaneously by the same parties. "[T]hey will be read and construed together, although they do not in terms refer to each other." *Place v. Place*, 207 Kan. 734, Syl. ¶ 1,

13

486 P.2d 1354 (1971). See *Insurance Co. v. Hanks*, 83 Kan. 96, 103, 110 Pac. 99 (1910). And when "instruments are construed together . . . the general purpose of the entire transaction should control." *Place*, 207 Kan. 734, Syl. ¶ 2. See *In re Estate of Garden*, 158 Kan. 554, 562, 148 P.2d 745 (1944) (the fact that complementary instruments do not refer to each other does not detract from their significance as integral and related parts of one contract).

Here, there is ample evidence that all three written contracts were considered to be one written agreement to accomplish the break-up between Lerner and Mnichowski. Not only were the contracts executed at the same time and concerning the same subject matter, but they also explicitly referred to each other.

But Mnichowski also argues that the contracts have different parties. The parties to the exchange agreement were Mnichowski, Lerner, Cold Train, CM Financial Group, Inc., and CMF Leasing, Inc. The parties to the promissory note were Cold Train and Rail. The parties to the pledge agreement were Mnichowski and Rail. Thus, Mnichowski argues that the court must consider each contract separately to see if Rail presented legally sufficient evidence from which a reasonable jury could find Mnichowski liable for the claimed breach.

"The primary rule in construction of any contract is to ascertain the intent of the parties, and such intent may best be determined by looking at the language employed and taking into consideration all the circumstances and conditions which confronted the parties when they made the contract." *New Hampshire Ins. Co. v. Fox Midwest Theatres, Inc.*, 203 Kan. 720, Syl. ¶ 1, 457 P.2d 133 (1969)

In *Atlas Industries, Inc. v. National Cash Register Co.*, 216 Kan. 213, 531 P.2d 41 (1975), the court examined the relationship between the parties who executed three written documents. Though not all three documents were signed by the same three

14

parties, the court read and construed them together because of the interrelated nature of the documents and because "the true nature and character of a document is not determined by the name attached thereto but by the intent of the parties as reflected by the terms or the contents thereof." 216 Kan. at 220 (citing *Atwell v. Maxwell Bridge Co.,* 196 Kan. 219, 409 P.2d 994 [1966]).

Here, the overall settlement was primarily between Lerner and Mnichowski but also included various entities they controlled. The exchange agreement, which included Mnichowski and Lerner and entities they owned or controlled, was intended to separate the ownership of Rail from the ownership of Cold Train. The promissory note memorialized the various loans Rail had made to Cold Train during the time Lerner and Mnichowski jointly owned Cold Train, loans which were not of particular concern when Lerner and Mnichowski both owned these entities, but which now needed to be dealt with given the change in ownership of Cold Train and Rail. The pledge agreement provided security for the promissory note which was needed to separate the interests of Lerner and Mnichowski in these entities. The district court accurately expressed the relationship of the parties:

> "From the outset, this case was about the failed business relationship of two men. Both were owners and decision makers in several different but somewhat related companies. Some of the companies were solely owned by Mr. Mnichowski. The bottom line was that these men had intertwined their business relationships and then found that it was not working for them. So, they negotiated a split. The breakup, or business divorce, was between the two men. The vehicles by which they did business were those several different entities. Although the law recognizes the entities [as] separate persons the real dispute that led to the divorce was between the two principal men, Michael Lerner and Chris Mnichowski."

Even so, Mnichowski signed the promissory note on behalf of Cold Train, the "Maker," and not in his individual capacity. The document did not expressly provide that

15

Mnichowski was personally liable under the promissory note. Thus, if Rail's breach of contract claim was based solely on the breach of the terms of the promissory note, it would fail.

But Rail's breach of contract claim was not based solely on the promissory note which Mnichowski did not sign. Rail did not seek judgment against Mnichowski for the unpaid balance on the note. Rail's claim was based on Mnichowski stripping away and encumbering Cold Train's assets, contrary to the pledge agreement, so as to make it impossible for Cold Train to pay back its obligations to Rail under the promissory note. Evidence of this is found in Mnichowski's own admission that he breached the pledge agreement and Lawson's testimony about Mnichowski's self-described Machiavellian scheme to strip Cold Train of its assets so that nothing would be left for its creditors, including Rail. To that end, Mnichowski diverted Cold Train's assets to himself and to entities he owned and encumbered Cold Train's asserts as a part of his dealings with BNSF.

Mnichowski's final argument on this issue is that Rail already obtained relief for any breach of pledge agreement when it took over Cold Train. The pledge agreement provided:

> "Upon the occurrence of an Event of Default . . . , [Rail] . . . is hereby authorized and
> empowered to transfer and register in its name or in the name of its nominee the whole or
> any part of the Pledged Collateral . . . to exercise the voting and all other rights as a
> holder with respect thereto, to collect and receive all cash dividends, interest, principal
> and other distributions made thereon, to sell in one of more sales . . . the whole or any
> part of Pledged Collateral and to otherwise act with respect to Pledged Collateral as
> though [Rail] was the outright owner thereof."

But the pledge agreement does not provide that taking over Cold Train is Rail's exclusive remedy and does not foreclose an action for damages. Rail's reacquisition of

16

Cold Train was an inadequate remedy because so many of Cold Train's assets had already been transferred away. Thus, Rail was entitled to sue Mnichowski under the theory that his breach of the pledge agreement damaged Rail. The damages Rail sought were not measured by the balance due on the promissory note. The jury understood this in awarding Rail $117,783.02 in damages under this theory of recovery.

The district court did not err in denying the motions for judgment as a matter of law on these claims.

*$1,413,396.17 Loan—Erroneous Instruction*

Mnichowski next claims that Jury Instruction No. 12 was erroneous because it stated that the three written agreements comprising the settlement agreement—the exchange agreement, the promissory note, and the pledge agreement—should be considered jointly.

Jury Instruction No. 12 stated:

"That, with respect to the $1,413,396.17 loan, Defendant Mnichowski breached the separation agreements reached with plaintiffs in December of 2010, namely, the Exchange Agreement, the Pledge Agreement, and the Promissory Note, considered jointly, by encumbering the assets of Cold Train, L.L.C., and by transferring away from Cold Train, L.L.C., to himself and to other defendants, its valuable assets."

Mnichowski objected to this instruction and preserved the issue for appeal. Our standards for reviewing jury instructions are well known to the parties and can be found in *Foster v. Klaumann*, 296 Kan. 295, 301-02, 294 P.3d 223 (2013). Further, in a civil case such as this, the district court is required to give an instruction supporting a party's

17

theory of the case if the instruction is requested and there is evidence supporting the theory which, if accepted as true when viewed in the light favoring the requesting party, is sufficient to support a verdict based upon it. See *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 419, 228 P.3d 1048 (2010).

Instruction No. 12 is a contentions instruction. It sets forth the claims and defenses of the parties. It does not present principles of law which the jury must apply to the case, except for the sections of the instruction stating the various burdens of proof on the different claims and defenses. The substantive instructions on the applicable principles of law included instructions on the basic principles of contracts, to which there is no claim of error. It was up to the jury to find the elements necessary on the breach of contract claims.

Mnichowski claims that Rail alleged only a breach of the pledge agreement, which does not include an explicit promise to repay the $1,413,396.17 loan, and it was error for the district court to state that all three written documents should be considered jointly. But, of course, this ignores the facts that this was merely Rail's contention. Without providing support for his argument, Mnichowski merely alleges that including references to the exchange agreement, the promissory note, and the $1,413,396.17 loan may have misled the jury and prejudiced him. He acknowledges that his argument on this claim of error is the same as his argument he asserted in his first claim of error. We need not repeat here our analysis on this issue. It suffices to say that based on that analysis, we find no error in this instruction.

In his reply brief, Mnichowski raises a new issue on appeal regarding this instruction's use of the phrase "with respect to the $1,413,396.17 loan." This argument was not asserted in his appellate brief. An appellant may not raise new issues in a reply brief. *State v. McCullough*, 293 Kan. 970, 984-85, 270 P.3d 1142 (2012). See Supreme Court Rule 6.05 (2017 Kan. S. Ct. R. 36). Accordingly, we do not address this issue.

18

*$1,413,396.17 Loan—Sufficiency of the Evidence*

Mnichowski's last contention with respect to the $1,413,396.17 loan is that there is insufficient evidence to support the jury's verdict. This is another variation of the same argument raised in the first issue we discussed. Our analysis remains the same and we find no insufficiency in the evidence supporting this claim.

*$320,000 Line of Credit—Judgment as a Matter of Law.*

Mnichowski's first claim regarding Cold Train's $320,000 line of credit is that the district court should have granted him judgment as a matter of law. As noted earlier, in the exchange agreement Rail agreed to loan Cold Train $320,000 in the form of a line of credit line for Cold Train's "working capital, day-to-day needs, [and] cash needs." Mnichowski claims he was not personally responsible for repaying Cold Train's line of credit so he cannot be liable for Cold Train's breach.

Rail's breach of contract claims were outlined in Jury Instruction No. 12, which provided:

> "That, with respect to the $320,000 loan, Defendant Mnichowski breached the separation agreements reached with plaintiffs in December of 2010, namely, the Exchange Agreement, the Pledge Agreement, and the Promissory Note, considered jointly, by encumbering the assets of Cold Train, L.L.C., and by transferring away from Cold Train, L.L.C., to himself and to other defendants, its valuable assets."

Mnichowski argues, "the only promise to repay [the $320,000] loan is contained in the Exchange Agreement, and the promise is made by Cold Train, not [by him]."

Rail gave Cold Train a line of credit in the amount of approximately $320,000 in order to help Cold Train establish itself as an independent entity. Rail did not claim that

19

Mnichowski was personally liable on the credit line. Rather, Rail claimed that by his breach of the pledge agreement, Mnichowski stripped Cold Train of its assets so as to render it incapable of repaying this debt.

The applicable analysis of this issue is found in our discussion of Mnichowski's first claim of error. Based on that analysis, we conclude that the district court properly denied the motions for judgment as a matter of law on this issue. There was a legal basis for the jury to conclude that Mnichowski's breach caused Cold Train to be unable to repay Rail for its draws on the $320,000 credit line.

*$320,000 Line of Credit—Erroneous Instruction*

Mnichowski repeats here the jury instruction argument that he raised with respect to the district court's instruction on the $1,413,396.17 loan discussed above. The only difference is that Rail's breach of contract claim here was in regards to Cold Train's failure to repay the draws on its $320,000 line of credit. Our analysis remains the same. We find no error in the district court giving this instruction.

*$320,000 Line of Credit—Sufficiency of the Evidence*

Again, rather than making a separate argument to support this issue, Mnichowski relies on the arguments he presented with respect to the $1,413,396.17 loan. He argues:

> "Rail only alleged and presented evidence that Mnichowski breached the Pledge Agreement. Moreover, Pledge Agreement contains no promise to repay the $320,000 loan; the only promise to repay that loan is contained in the Exchange Agreement, and the promise is made by Cold Train, not Mnichowski."

20

As previously discussed, there is a legal basis to construe all three of the written documents together as one contract. Mnichowski stipulated to the fact that he breached the pledge agreement by pledging the assets of Cold Train. As previously explained, there was evidence presented at trial to support the fact that this breach, along with his stripping of assets from Cold Train, rendered it incapable of repaying its debt to Rail. The jury considered Rail's claim and awarded damages in the amount of $247,308.41. There is evidence in the record supporting the jury's verdict.

*Constructive Fraud Claim—Motion for Judgment as a Matter of Law*

Mnichowski argues that the district court erred in denying his motion for judgment as a matter of law on Rail's claim of constructive fraud because Rail failed to present evidence at trial from which a reasonable person could find the existence of a confidential relationship between Mnichowski and Rail.

This issue has been preserved for appellate review. It was raised at the close of the plaintiffs' case, at the close of all the evidence, and again in posttrial motions. We apply the same review standards on appeal that were described with respect to Mnichowski's second issue above.

Our Supreme Court has defined constructive fraud as ""a breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others or violate a confidence, and neither actual dishonesty [n]or purpose or intent to deceive is necessary."' [Citation omitted.]" *Schuck v. Rural Telephone Service Co.*, 286 Kan. 19, 26, 180 P.3d 571 (2008). In order to be successful on a claim of constructive fraud, the plaintiff must show:  (1) a confidential relationship, and (2) a betrayal of a confidence or breach of a duty imposed by the relationship. 286 Kan. at 26.

21

The jury awarded Rail $10,000 on this claim, based on the transfer of Cold Train's assets to Mnichowski and his companies. Rail presented evidence that Mnichowski had a contractual relationship with Cold Train, but Mnichowski argues that Rail did not present evidence of a confidential relationship; *i.e.*, that Rail placed "'special trust and confidence'" in him. In fact, Lerner, the owner of Rail, testified that he wanted to break up the ownership of Rail and Cold Train because he did *not* trust Mnichowski to act fairly. Based on this testimony, Mnichowski argues that no reasonable jury could find that Rail placed "special trust and confidence" in him.

We agree. A confidential or fiduciary relationship refers to any relationship of blood, business, friendship, or association in which one party reposes special trust and confidence in the other party who is in a position to have and to exercise influence over the first party. *Heck v. Archer*, 23 Kan. App. 2d 57, 63, 927 P.2d 495 (1996).

> "[G]enerally there are two types of fiduciary relationships: (1) those specifically created by contract . . . [or] by formal legal proceedings . . . , and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions. The determination of the existence of a fiduciary relationship of the first category . . . is usually relatively simple. The second category . . . becomes much more difficult to determine and must depend upon the facts in each case." *Denison State Bank v. Madeira*, 230 Kan. 684, 691, 640 P.2d 1235 (1982).

Here, the confidential relationship Rail seeks to impose on Mnichowski is claimed to arise out of the circumstances of the transaction and the relationship of the parties, matters which are unique to each case. The court in *Denison State Bank* expressed no exact definition of a confidential or fiduciary relationship, but the court provided some guiding principles:

22

"A fiduciary relationship imparts a position *of peculiar confidence placed by one individual in another*. A fiduciary is a person with a duty to *act primarily for the benefit of another*. A fiduciary is in a position to have and exercise, and does *have and exercise influence over another*. A fiduciary relationship implies a condition of *superiority of one of the parties over the other*. Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary*. See generally, 36A C.J.S., Fiduciary, p. 381 *et seq*." *Denison State Bank*, 230 Kan. at 692.

Further, a confidential or fiduciary relationship generally implies that one party is weaker than the other, either in business intelligence, knowledge of facts, or mental strength, thus giving the other party an advantage. 230 Kan. at 692.

Here, Rail asserts that the confidential relationship was based on its dependence on Mnichowski to maintain adequate security for the loans of $1,413,396.17 and $320,000. But Rail was able to provide certain protections in the contract—such as the requirement for monthly financial reports and the remedy that Cold Train would be immediately turned over to Rail upon a breach—and Rail was not in a position inferior to that of Mnichowski. Lerner was an experienced businessman, able to protect his own interests in his business dealings with Mnichowski.

For example, in the exchange agreement Mnichowski agreed to provide monthly balance sheets and income statements within 20 days after the end of each month so long as Cold Train was indebted to Rail. Mnichowski failed to provide monthly statements to Rail from the get-go. He sent the first financial statement to Rail in July 2011, and it covered only the first quarter of that year. Rail could have declared a breach and filed suit when the first monthly financial statement was not provided.

Rail claims it placed a great deal of trust in Mnichowski by loaning Cold Train a significant amount of money in the division of the companies. But Rail fails to explain how this amounted to a confidential relationship. Such an argument, if valid, would tend

23

to support a claim that any borrower is in a relationship of trust and confidence with its lender.

Rail has not shown that it was in a weaker position than Mnichowski. Rail was able to contract to protect its interests. Rail and Mnichowski were familiar with each other and did not trust one another. The agreement was reached to effect an end to the relationship. There is no evidence that Rail was in a weaker position or dependent upon Mnichowski. Both parties, represented by counsel, were able to negotiate a contract to protect their interests. There is no evidence of a confidential relationship. In fact, the relationship between the parties can be characterized more accurately as a relationship of mistrust and lack of confidence rather than a relationship of trust and confidence. Thus, we conclude that the district court erred when it denied the defendants' motion for judgment as a matter of law on the constructive fraud claim and reverse the $10,000 award for constructive fraud.

Mnichowski raises additional issues regarding the court's instruction to the jury on this claim and the sufficiency of the evidence to support the jury's verdict on this claim. In view of our last ruling, these issues are now moot.

Affirmed in part and reversed in part.